No. 15-2056

## UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

---

**G.G., by his next friend and mother, DEIRDRE GRIMM**

*Plaintiff-Appellant*,

**v.**

**GLOUCESTER COUNTY SCHOOL BOARD,**

*Defendant-Appellee.*

---

Appeal from the United States District Court for the Eastern District of Virginia
The Honorable Robert G. Doumar, No. 4:15-CV-54

---

**BRIEF OF *AMICI CURIAE* THE NATIONAL WOMEN'S LAW CENTER, LEGAL MOMENTUM, THE ASSOCIATION OF TITLE IX ADMINISTRATORS, EQUAL RIGHTS ADVOCATES, GENDER JUSTICE, THE WOMEN'S LAW PROJECT, LEGAL VOICE, LEGAL AID SOCIETY-EMPLOYMENT LAW CENTER, SOUTHWEST WOMEN'S LAW CENTER, AND CALIFORNIA WOMEN'S LAW CENTER ON BEHALF OF PLAINTIFF-APPELLANT AND IN SUPPORT OF REVERSAL**

---

Suzanne B. Goldberg, Esq.
Sexuality and Gender Law Clinic
Columbia Law School
435 West 116th Street
New York, New York 10027
Telephone: 212.854.411

Erin E. Buzuvis, Esq.
Western New England
University School of Law
1215 Wilbraham Road
Springfield, MA 01119
Telephone: 413.782.1405

*Counsel for Amici Curiae*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................... ii

IDENTITY AND INTEREST OF THE *AMICI CURIAE* ........................................1

SUMMARY OF ARGUMENT ..................................................................2

ARGUMENT ...............................................................................2

    I.    TITLE IX PROHIBITS DISCRIMINATION AGAINST
         TRANSGENDER STUDENTS................................................2

    II.   THE SCHOOL'S POLICY VIOLATES TITLE IX BECAUSE IT
         DISCRIMINATES AGAINST TRANSGENDER STUDENTS ..........10

    III.  SECTION 106.33 DOES NOT AUTHORIZE OR JUSTIFY
         DISCRIMINATION AGAINST TRANSGENDER STUDENTS .......12

CONCLUSION ............................................................................16

CERTIFICATE OF COMPLIANCE.............................................................18

CERTIFICATE OF SERVICE ...............................................................19

i

# TABLE OF AUTHORITIES

## Cases

*Auer v. Robbins*,
    519 U.S. 452 (1997) ............................................................................ 14

*Beardsley v. Webb*,
    30 F.3d 524 (4th Cir. 1994) ................................................................ 3

*Franklin v. Gwinnett County Pub. Sch.*,
    503 U.S. 60 (1992) ............................................................................... 3

*Glenn v. Brumby*,
    663 F.3d 1312 (11th Cir. 2011) ...................................................... 2, 4

*Holloway v. Arthur Anderson & Co.*,
    566 F.2d 659 (9th Cir. 1977) ............................................................. 5

*Jennings v. Univ. of N. Carolina*,
    482 F.3d 686 (4th Cir. 2007) ............................................................. 3

*Lusardi v. McHugh*,
    Appeal No. 0120133395, 2015 WL 1607756 (EEOC Apr. 1, 2015) ............... 3, 9

*Macy v. Holder*,
    Appeal No. 0120120821, 2012 WL 1435995 (EEOC Apr. 20, 2012) ......... 3, 4, 5

*Mercer v. Duke Univ.*,
    190 F.3d 643 (4th Cir. 1999) ............................................................ 15

*Miles v. New York University*,
    979 F. Supp. 248 (S.D.N.Y. 1997) ............................................... 3, 13

*Oncale v. Sundowner Offshore Services, Inc.*,
    523 U.S. 75 (1998) ............................................................................... 6

*Price Waterhouse v. Hopkins*,
    490 U.S. 228 (1989) ............................................................................ 6

*Rosa v. Park West Bank & Trust Co.*,
 214 F.3d 213 (1st Cir. 2000) ................................................................ 2

*Rumble v. Fairview Health Servs.*,
 No. 14-CV-2037, 2015 WL 1197415 (D. Minn. Mar. 16, 2015)........................ 5

*Schroer v. Billington*,
 577 F. Supp. 2d 293 (D.D.C. 2008) ........................................................ passim

*Schwenk v. Hartford*,
 204 F.3d 1187 (9th Cir. 2000) .................................................... 2, 6, 13

*Smith v. City of Salem*,
 378 F.3d 566 (6th Cir. 2004) .................................................... 2, 7, 13

*Ulane v. E. Airlines, Inc.*,
 742 F.2d 1081 (7th Cir. 1984) .............................................................. 5

*United States v. Larionoff*,
 431 U.S. 864 (1977) .......................................................................... 15

**Statutes**

34 C.F.R. § 106.33 ........................................................................ 13, 14

Fed. R. App. P. 29 ............................................................................ 1

**Other Authorities**

AMERICAN PSYCHOLOGICAL ASSOCIATION, POLICY ON TRANSGENDER, GENDER
 IDENTITY & EXPRESSION NON-DISCRIMINATION (2015), *available at*
 http://www.apa.org/about/policy/transgender.aspx.............................................12

ARCADIA UNIFIED SCH. DIST., TRANSGENDER STUDENTS – ENSURING EQUITY
 AND NONDISCRIMINATION (2015), *available at* http://www.nclrights.org/wp-
 content/uploads/2015/07/Transgender-Policy-Bulletin-Approved-w-
 corrections-April-2015.pdf.......................................................................8

Harper Jean Tobin & Jennifer Levi, *Securing Equal Access to Sex-
 Segregated Facilities for Transgender Students*, 28 WIS. J.L.
 GENDER & SOC'Y 301 (2013) ............................................................ 16

OCCUPATIONAL HEALTH AND SAFETY ADMINISTRATION, DEP'T OF LABOR, BEST PRACTICES: A GUIDE TO RESTROOM ACCESS FOR TRANSGENDER WORKERS (2015), *available at* https://www.osha.gov/Publications/OSHA3795.pdf ............................................9

OFFICE FOR CIVIL RIGHTS, DEP'T OF EDUC., LETTER FROM ACTING DEPUTY ASSISTANT SECRETARY FOR POLICY (JAN. 7, 2015) ..............................................14

OFFICE FOR CIVIL RIGHTS, U.S. DEP'T OF EDUC., QUESTIONS AND ANSWERS ON TITLE IX AND SEXUAL VIOLENCE (2014), *available at* http://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf ................7

OFFICE FOR CIVIL RIGHTS, U.S. DEP'T OF EDUC., QUESTIONS AND ANSWERS ON TITLE IX AND SINGLE-SEX ELEMENTARY AND SECONDARY CLASSES AND EXTRACURRICULAR ACTIVITIES (2014), *available at* http://www2.ed.gov/about/offices/list/ocr/docs/faqs-title-ix-single-sex-201412.pdf......................................................................................................7

OFFICE OF INCLUSION, NAT'L COLLEGIATE ATHLETICS ASS'N, NCAA INCLUSION OF TRANSGENDER-STUDENT ATHLETES (2011), *available at* https://www.ncaa.org/sites/default/files/Transgender_Handbook_2011_Final.pdf......................................................................................................9

The American Medical Association, *AMA Calls for Modernizing Birth Certificate Policies*, Market Wired (2014), http://www.marketwired.com/press-release/ama-calls-for-modernizing-birth-certificate-policies-1918754.htm........................................................................12

U.S. OFFICE OF PERSONNEL MANAGEMENT, GUIDANCE REGARDING THE EMPLOYMENT OF TRANSGENDER INDIVIDUALS IN THE FEDERAL WORKPLACE (2015), *available at* https://www.opm.gov/policy-data-oversight/diversity-and-inclusion/reference-materials/gender-identity-guidance/................................9

**IDENTITY AND INTEREST OF THE *AMICI CURIAE***

*Amici* are non-profit legal and advocacy groups with expertise in both Title IX and sex discrimination issues more broadly, and a non-profit professional organization for school and college Title IX Coordinators and other administrators charged with enforcing Title IX compliance.   *Amici*, including the National Women's Law Center (NWLC), Legal Momentum, the Association of Title IX Administrators (ATIXA), Equal Rights Advocates (ERA), Gender Justice, the Women's Law Project (WLP), Legal Voice, Legal Aid Society-Employment Law Center (LAS-ELC), Southwest Women's Law Center, and California Women's Law Center respectfully seek leave to file the attached *amici curiae* brief in support of Plaintiff-Appellant in this matter.  *Amici* submit this brief because the district court's conclusion that Title IX permits a school to bar a transgender boy from using the same restroom facilities as other boys cannot be reconciled with controlling U.S. Supreme Court case law on the broad meaning of the term "sex" in federal anti-discrimination laws, or Title IX's broad prohibition of discrimination based on sex.

No counsel for a party has authored this brief in whole or in part, and no money has been contributed by any party or any party's counsel that was intended to fund preparing or submitting this brief. No person—other than *amicus curiae*, their members, and their counsel—have contributed money that was intended to fund preparing or submitting the brief.  *See* Fed. R. App. P. 29.

1

## SUMMARY OF ARGUMENT

The district court's conclusion that Title IX permits a school to bar a transgender boy from using the same restroom facilities as other boys cannot be reconciled with controlling U.S. Supreme Court case law on the broad meaning of the term "sex" in federal anti-discrimination laws, or Title IX's broad prohibition of discrimination based on sex. *Amici* urge this Court to correct this serious misapplication of Title IX and to clarify for courts below that policies that single out transgender students for adverse treatment violate Title IX.

## ARGUMENT

### I.   TITLE IX PROHIBITS DISCRIMINATION AGAINST TRANSGENDER STUDENTS

Discrimination against an individual for being transgender is sex discrimination.  Over the past two decades, courts and regulatory agencies have recognized with near unanimity that federal laws prohibiting sex discrimination, including Title IX, prohibit discrimination against transgender persons.  *See, e.g.*, *Glenn v. Brumby*, 663 F.3d 1312, 1317 (11th Cir. 2011) (Equal Protection Clause); *Schroer v. Billington*, 577 F. Supp. 2d 293, 305-06 (D.D.C. 2008) (Title VII); *Smith v. City of Salem*, 378 F.3d 566, 572 (6th Cir. 2004) (Title VII and Equal Protection Clause); *Schwenk v. Hartford*, 204 F.3d 1187, 1202 (9th Cir. 2000) (Gender Motivated Violence Act); *Rosa v. Park West Bank & Trust Co*., 214 F.3d 213, 214 (1st Cir. 2000) (Equal Credit Opportunity Act); *Miles v. New York University*, 979

2

F. Supp. 248 (S.D.N.Y. 1997) (Title IX); *Lusardi v. McHugh*, Appeal No. 0120133395, 2015 WL 1607756 (EEOC Apr. 1, 2015) (Title VII); *Macy v. Holder*, Appeal No. 0120120821, 2012 WL 1435995 (EEOC Apr. 20, 2012) (same).[1]

The reasoning of these decisions is straightforward. A transgender person's identity as male or female differs from their assigned sex at birth. Because what it means to be a transgender person is inherently linked to sex, discrimination against a person for being transgender *is* sex discrimination in the most basic sense. *See*, *e.g.*, *Macy*, 2012 WL 1435995, at *7 ("When an employer discriminates against someone because the person is transgender, the employer has engaged in disparate treatment related to the sex of the victim.") (internal quotation marks and citations omitted); *Schroer*, 577 F. Supp.2d at 308 (holding that an employer's withdrawal of a job offer after learning that the candidate was transgender "was literally 'discrimination because of . . . sex'").

---

[1] Courts regularly use Title VII case law to construe the Equal Protection Clause, Title IX, and other sex discrimination laws. *See*, *e.g.*, *Franklin v. Gwinnett County Pub. Sch.*, 503 U.S. 60, 75 (1992) (relying on Title VII case law to determine what constitutes sex-based harassment under Title IX); *Jennings v. Univ. of N. Carolina*, 482 F.3d 686, 695 (4th Cir. 2007) ("We look to case law interpreting Title VII of the Civil Rights Act of 1964 for guidance in evaluating a claim brought under Title IX."); *Beardsley v. Webb*, 30 F.3d 524, 529 (4th Cir. 1994) (Title VII standards apply to sex discrimination claims under the Equal Protection Clause). While this Court has not yet ruled on Plaintiff's sex discrimination claim under the Equal Protection Clause, that claim should also move forward for all of the reasons set forth in this brief.

In particular, discriminating against transgender persons because they have undergone a gender transition impermissibly discriminates based on sex. For example, in *Schroer v. Billington*, the plaintiff, a transgender woman, had applied for and was offered a job in the Library of Congress. 577 F. Supp. 2d at 296. That offer was rescinded after she disclosed her transgender status and intention to undergo a gender transition. *Id.* at 298-99. In addition to concluding that the employer engaged in unlawful sex stereotyping, the court held that refusing to hire someone because of their gender transition is, *per se*, discrimination on the basis of sex. *Id.* at 306-08. Just as refusing to hire someone because they have converted from one religion to another is discrimination that targets someone because of religion, so too does a refusing to hire someone because they have transitioned from male to female target that individual because of sex. *Id.* at 306-07; *see also Macy*, 2012 WL 1435995, at *11.

In addition, as the Eleventh Circuit explained in *Glenn v. Brumby*, discrimination against a transgender person also inevitably rests upon impermissible sex stereotypes. 663 F.3d at 1316. As the *Brumby* court explained: "A person is defined as transgender precisely because of the perception that his or her behavior transgresses gender stereotypes. '[T]he very acts that define transgender people as transgender are those that contradict stereotypes of gender-appropriate appearance and behavior.'" *Id.* (internal citations omitted); *see also Rumble v. Fairview Health*

4

*Servs.*, No. 14-CV-2037, 2015 WL 1197415, at *2 (D. Minn. Mar. 16, 2015) ("Because the term 'transgender' describes people whose gender expression differs from their assigned sex at birth, discrimination based on an individual's transgender status constitutes discrimination based on gender stereotyping."); *Macy*, 2012 WL 1435995, at *8 (holding that "consideration of gender stereotypes will inherently be part of what drives discrimination against a transgendered person").

This modern line of decisions supersedes older cases in which some courts rejected sex discrimination claims brought by transgender plaintiffs on the ground that sex discrimination laws must be construed narrowly to prohibit discrimination only because a person is male or female. For example, in *Holloway v. Arthur Anderson & Co.*, the Ninth Circuit held that a transgender woman had no protection under Title VII because she was not discriminated against "because she is male or female, but rather because she is a transsexual who chose to change her sex." 566 F.2d 659, 664 (9th Cir. 1977). These cases based their reasoning on Congressional intent, finding that Congress "had a narrow view of sex in mind" and "never considered nor intended that the 1964 legislation apply to anything other than the traditional concept of sex," meaning that Title VII prohibits only discrimination "against women because they are women and against men because they are men." *Ulane v. E. Airlines, Inc*., 742 F.2d 1081, 1085-86 (7th Cir. 1984).

Today, however, courts have recognized that such arguments fly directly in the face of the U.S. Supreme Court's holdings in *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989), and *Oncale v. Sundowner Offshore Services, Inc*., 523 U.S. 75 (1998). In *Price Waterhouse*, the Supreme Court rejected the notion that Title VII prohibits only discrimination against an employee solely because of her biological sex. Rather, the Court held, Title VII also prohibits discrimination based on requirements that employees adhere to sex-based expectations or stereotypes—in that case, the expectation that Ann Hopkins should dress, walk, and behave in a stereotypically "feminine" manner in order to be promoted to partner. 490 U.S. at 235. Similarly, in *Oncale v. Sundowner Offshore Services, Inc*., the U.S. Supreme Court held that Title VII prohibits male-on-male sexual harassment even though such harassment "was assuredly not the principal evil Congress was concerned with when it enacted Title VII." 523 U.S. at 79. As the Court explained, statutory prohibitions often go beyond the principal evil to cover reasonably comparable evils." *Id*.

Since these cases were decided, nearly every court and federal agency to consider the question has concluded that discrimination against a person for being transgender constitutes discrimination based on sex. As the Ninth Circuit explained in *Schwenk*, "[t]he initial judicial approach taken in cases such as *Holloway* has been overruled by the logic and language of *Price Waterhouse*." 204 F.3d at 1202.

6

"[D]iscrimination against a plaintiff who is transsexual . . . is no different from the discrimination directed against Ann Hopkins in *Price Waterhouse*." *Smith*, 378 F.3d at 575; *see also Schroer*, 577 F. Supp. 2d at 307 (rejecting reasoning in *Ulane* as "representing an elevation of 'judge-supposed legislative intent over clear statutory text'").

Of particular relevance here, both the Department of Education and the Department of Justice have found that Title IX prohibits discrimination against transgender students. OFFICE FOR CIVIL RIGHTS, U.S. DEP'T OF EDUC., QUESTIONS AND ANSWERS ON TITLE IX AND SEXUAL VIOLENCE 5 (2014), *available at* http://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf ("Title IX's sex discrimination prohibition extends to claims of discrimination based on gender identity or failure to conform to stereotypical notions of masculinity or femininity"); OFFICE FOR CIVIL RIGHTS, U.S. DEP'T OF EDUC., QUESTIONS AND ANSWERS ON TITLE IX AND SINGLE-SEX ELEMENTARY AND SECONDARY CLASSES AND EXTRACURRICULAR ACTIVITIES 25 (2014), *available at* http://www2.ed.gov/about/offices/list/ocr/docs/faqs-title-ix-single-sex-201412.pdf ("[T]ransgender students . . . are protected from sex-based discrimination under Title IX" and must be "treat[ed] consistent with their gender identity.").

7

Similarly, in July 2015, the Department of Justice and the Department of Education's Office for Civil Rights approved a nondiscrimination policy for transgender students adopted by the Arcadia Unified School District, which was created in response to a Title IX complaint filed by a transgender student in the district. That policy affirms that transgender students must be treated in accordance with their gender identity, including with respect to bathrooms: "Schools may maintain separate restroom facilities for male and female students. Students shall have access to restrooms that correspond to their gender identity asserted at school." ARCADIA UNIFIED SCH. DIST., TRANSGENDER STUDENTS – ENSURING EQUITY AND NONDISCRIMINATION (2015), *available* *at* http://www.nclrights.org/wp-content/uploads/2015/07/Transgender-Policy-Bulletin-Approved-w-corrections-April-2015.pdf.[2]

Both the EEOC and the federal government's Office of Personnel Management have also recognized that, under Title VII, transgender employees must be able to use the same restroom facilities used by others, regardless of whether they

---

[2] To address a concern for privacy raised by *any* student, not just a transgender student, the policy also provides: "If a student desires increased privacy, regardless of the underlying reason, the administrator shall make every effort to provide the student with reasonable access to an alternative restroom such as a single-stall restroom or the health office restroom." ARCADIA UNIFIED SCHOOL DISTRICT, "TRANSGENDER STUDENTS – ENSURING EQUITY AND NONDISCRIMINATION," at 4. This provision applies equally to all students and does not permit a school to force a transgender student to use a separate bathroom.

have undergone any medical treatment.  In *Lusardi v. McHugh*, the EEOC held that under Title VII, "where . . . a transgender female has notified her employer that she has begun living and working full-time as a woman, the agency must allow her access to the women's restrooms."  2015 WL 1607756, at *8.  "Title VII prohibits discrimination based on sex whether motivated by hostility, by a desire to protect people of a certain gender, by gender stereotypes, or by the desire to accommodate other people's prejudices."  *Id.* at *9; s*ee also* U.S. Office of Personnel Management, Guidance Regarding the Employment of Transgender Individuals in the Federal Workplace (2015), *available at* https://www.opm.gov/policy-data-oversight/diversity-and-inclusion/reference-materials/gender-identity-guidance/ ("Transitioning employees should not be required to have undergone or to provide proof of any particular medical procedure (including gender reassignment surgery) in order to have access to facilities designated for use by a particular gender.")[3]

---

[3] The NCAA has similarly issued guidelines requiring that transgender students "should be able to use . . . toilet facilities in accordance with the student's gender identity.  Office of Inclusion, Nat'l Collegiate Athletics Ass'n, NCAA Inclusion of Transgender-Student Athletes 20 (2011), *available at* https://www.ncaa.org/sites/default/files/Transgender_Handbook_2011_Final.pdf. The Department of Labor's Occupational Health and Safety Administration (OSHA) has issued similar guidance.  *See* Occupational Health and Safety Administration, Dep't of Labor, Best Practices: A Guide to Restroom Access for Transgender Workers (2015), *available at* https://www.osha.gov/Publications/OSHA3795.pdf.

## II.   THE SCHOOL'S POLICY VIOLATES TITLE IX BECAUSE IT DISCRIMINATES AGAINST TRANSGENDER STUDENTS

A school policy that excludes a transgender boy from the boys' restroom discriminates against transgender students on its face.  Such a policy discriminates based on sex just as overtly and directly as would any other policy that singled out a subset of girls or boys based on any other sex-related characteristic and required them to use a specially designated, segregated bathroom for that reason.  For example, a school plainly would violate Title IX by requiring feminine-appearing boys or masculine-appearing girls to use a separate bathroom.  The policy at issue here similarly violates Title IX for multiple reasons.  First, it uses a sex-based characteristic—whether a student is transgender—to subject students to adverse differential treatment.  Non-transgender boys have access to the boys' student restroom.  Transgender boys do not.

Second, the policy impermissibly discriminates based on sex by penalizing transgender students because they have undergone a gender transition.  Boys who were assigned male at birth have access to the boys' student restroom.  Boys who were assigned female at birth and who have undergone a gender transition to live consistently with their male identity do not.  G. may not lawfully be penalized or treated differently than other boys simply because he transitioned from female to male.  *See*, *e.g.*, *Schroer*, 577 F. Supp.2d at 306-07.

10

Finally, the policy discriminates based on sex because it rests on the sex-based stereotype that all boys are assigned male at birth and all girls are assigned female at birth. Indeed, it bears mention that if the school were unaware of G.'s private medical history and transgender status, it is unclear how or whether the policy would apply. G. has changed his legal sex, obtained government-issued identification that correctly classifies him as male, and undergone medical treatment to make many of his physiological characteristics consistent with those typically associated with males. A policy that requires him to use a separate facility—thereby publicly identifying him as transgender—derives from and reinforces the stereotypical assumption that everyone must identify and live consistently with their assigned sex at birth. Such a stereotyped view effectively erases the very existence of transgender youth.

Indeed, the overt premise and message of the policy is that transgender students are not fully or "really" male or female, but something "other," and that they must be targeted and segregated from other students, based on their transgender status, when using the restroom. As the record makes plain, the sole purpose of the policy challenged in this case is to bar a transgender boy from using the restroom facility available to all other boys. The result is to isolate the boy in a stigmatizing and humiliating way, making him use a specially designated single-user bathroom,

11

since (as the policy implicitly acknowledges) it would be unworkable for a transgender boy, as it would be for any other boy, to use a girls' facility.[4]

In sum, the bathroom policy challenged in this case violates Title IX because it uses a sex-based characteristic—*i.e.*, being transgender—to impose a discriminatory policy and to bar a particular group of students from equal treatment and equal educational opportunities.

## III.    SECTION 106.33 DOES NOT AUTHORIZE OR JUSTIFY DISCRIMINATION AGAINST TRANSGENDER STUDENTS

Contrary to the district court's analysis, the Department of Education regulation permitting separate bathrooms for boys and girls does not authorize or justify discriminatory treatment of transgender students.  The regulation provides:

---

[4] Notably, the nation's leading professional medical and mental health organizations have called upon courts and legislatures to protect transgender people from discrimination.  For example, the American Psychological Association "opposes all public and private discrimination on the basis of actual or perceived gender identity and expression and urges the repeal of discriminatory laws and policies."  AMERICAN PSYCHOLOGICAL ASSOCIATION, POLICY ON TRANSGENDER, GENDER IDENTITY & EXPRESSION                    NON-DISCRIMINATION (2015), *available        at* http://www.apa.org/about/policy/transgender.aspx.    Similarly, the American Medical Association has adopted a policy supporting the elimination of any requirement that a transgender person must have undergone surgery in order to change the sex indicated on a birth certificate or other government-issued identification documents.  *See* The American Medical Association, *AMA Calls for Modernizing   Birth   Certificate   Policies*,   Market   Wired   (2014), http://www.marketwired.com/press-release/ama-calls-for-modernizing-birth-certificate-policies-1918754.htm.  Today, in other words, there is no legitimate basis for courts to view transgender men and women as somehow less "real" than other people, or to question the validity of their identities as male or female.

"A recipient may provide separate toilet . . . facilities on the basis of sex, but such facilities provided for students of one sex shall be comparable to such facilities provided for students of the other sex."  34 C.F.R. § 106.33 (hereinafter, "Section 106.33").  According to the district court, this regulation means that schools may permissibly maintain separate bathrooms based on "biological sex" and that a school does not "run afoul of Title IX by limiting [a transgender boy] to the bathroom assigned to his birth sex."  That analysis misconstrues the applicable law and, if accepted by this Court, would significantly undermine the protections afforded by Title IX, to the detriment of all students.

The district court's construction of Section 106.33 improperly disregards the Department of Education's guidance and, as a result, needlessly sets the regulation on a collision course with Title IX.  Section 106.33 provides that schools may have separate restrooms for boys and girls, but it does not address the question of which of those facilities must be available to a transgender boy, nor does it say anything about "biological" sex.  As explained above, contemporary courts and agencies have correctly interpreted Title IX, along with other federal civil rights laws, to protect transgender persons, rejecting prior case law that construed the term "sex" to mean only a person's "biological" sex. *See*, *e.g*., *Miles*, 979 F. Supp. 248; *Smith*, 378 F.3d 566; *Schwenk*, 204 F.3d 1187.  Consistent with that precedent, the Department of Education has explained: "When a school elects to separate or treat students

13

differently on the basis of sex in [restrooms], a school must treat transgender students consistent with their gender identity."  OFFICE FOR CIVIL RIGHTS, DEP'T OF EDUC., LETTER FROM ACTING DEPUTY ASSISTANT SECRETARY FOR POLICY (Jan. 7, 2015).

Instead, by interpreting Section 106.33 to mean "birth or biological sex," the district court's ruling improperly authorizes discrimination against transgender students in contravention of Title IX.  By contrast, interpreting Section 106.33 consistently with other Title IX and Title VII case law to prohibit discrimination against transgender students (as the Department's guidance provides) is both workable and consistent with the statute's anti-discrimination commands.  It is the only reasonable interpretation, and the district court's disregard for the Department's guidance was improper.  *See Auer v. Robbins*, 519 U.S. 452, 461 (1997) (holding that an agency's interpretation of its own implementing regulations is "controlling unless plainly erroneous or inconsistent with the regulation") (citations and internal quotes omitted).

In effect, the district court interprets Section 106.33 as excluding school bathroom policies from the requirements of Title IX, so long as the facilities provided for boys and girls are equal.  But that interpretation violates canons of regulatory and statutory construction that require regulations to be interpreted in harmony with the statutes they implement.  *See*, *e.g*., *United States v. Larionoff*, 431 U.S. 864, 873 (1977) ("[R]egulations, in order to be valid, must be consistent with

14

the statute under which they are promulgated."); *cf. Mercer v. Duke Univ.*, 190 F.3d 643, 647 (4th Cir. 1999) (holding that Title IX regulations permitting certain exemptions for sex-segregated sports must be read consistently with the overall purposes of the statute and, in particular, with "indisputable congressional intent to prohibit discrimination in all circumstances where such discrimination is unreasonable").

The district court erroneously suggests that if Title IX requires schools to let a transgender boy use the same bathroom as other boys, that would "interpret the use of the term 'sex' in Section 106.33 to mean *only* 'gender identity,'" and to permit "the use of separate bathrooms on the basis of gender identity and *not* on the basis of birth or biological sex." That argument disregards the obvious: for all non-transgender students, gender identity and the other attributes of sex are congruent. As a result, a rule purportedly requiring students to use restrooms based on their "birth or biological sex" in fact permits all non-transgender students to use restrooms based on their gender identity, while preventing transgender students—and only transgender students—from doing so. A rule that provides access based on a person's gender identity maintains the status quo for all non-transgender students— non-transgender boys use the boys' restroom and non-transgender girls' use the girls' restroom—while ensuring the ability of transgender students to function daily in schools.

A policy that ignores the reality of a transgender student's life by ignoring his gender identity "singles [him] out, apart from all others in the community, with a stigmatizing message that a transgender boy is not a normal or real boy."  Harper Jean Tobin & Jennifer Levi, *Securing Equal Access to Sex-Segregated Facilities for Transgender Students*, 28 WIS. J.L. GENDER & SOC'Y 301, 309 (2013).  In effect, "a school that denies equal access to facilities consistent with a student's affirmed gender is saying that a transgender girl cannot attend school as a transgender girl, but only as a boy, which she is not."  *Id*. at 310.  Such a policy not only harms transgender youth, but sends a harmful message to all students that discrimination against those who depart from sex stereotypes or expectations is permissible.

## CONCLUSION

The district court's ruling conflicts with controlling precedent rejecting a narrowly biological interpretation of the term "sex" in federal anti-discrimination statutes, including decisions by the U.S. Supreme Court.  To uphold such a ruling would be devastating for transgender students, who effectively would be excluded from the ability to attend public schools except at the price of daily humiliation and stigma imposed by school officials in a way that is almost certain to cause them lasting harm.  It would also undermine the broad remedial purpose of Title IX, lending credence to outmoded and harmful sex stereotypes, and making it more

difficult for all students to maximize their potential and enjoy equal educational opportunities unimpeded by discrimination because of sex.

Amici respectfully ask this Court to reverse the district court's order dismissing G.'s Title IX claim.

Dated: October 28, 2015                        Respectfully submitted,


                                               By:  /s/ Suzanne B. Goldberg
                                                    *Counsel for Amici Curiae*

# CERTIFICATE OF COMPLIANCE

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 3,817 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii)

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2013 in 14-point Times New Roman type style.

Dated: October 28, 2015                    By: /s/ Suzanne B. Goldberg
                                                          *Counsel for Amici Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system on October 28, 2015.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated: October 28, 2015                    By:  /s/ Suzanne B. Goldberg
                                               *Counsel for Amici Curiae*

19