No. 15-2056

---

**IN THE
UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT**

---

**G.G., by his next friend and mother, Deirdre Grimm,**

Appellant,

v.

**Gloucester County School Board,**

Appellee.

---

On Appeal from the United States District Court
for the Eastern District of Virginia
Newport News Division

---

**BRIEF OF *AMICI CURIAE*
THE WORLD PROFESSIONAL ASSOCIATION FOR TRANSGENDER
HEALTH, PEDIATRIC ENDOCRINE SOCIETY, ET AL.
IN SUPPORT OF APPELLANT**

---

Jennifer Levi
Gay & Lesbian Advocates &
  Defenders
30 Winter Street, Ste 800
Boston, MA 02108
Tel.: 617.426.1350

Thomas M. Hefferon
GOODWIN PROCTER LLP
901 New York Avenue NW
Washington, DC 20001
Tel.: 202.346.4000
Fax: 202.346.4444


Dated:      October 28, 2015

Attorneys for *Amici Curiae*

Shannon Minter
Asaf Orr
National Center for
  Lesbian Rights
870 Market Street, Ste 370
San Francisco, CA 94102
Tel.: 415.392.6257

Mary K. Dulka
GOODWIN PROCTER LLP
620 Eighth Avenue
New York, NY 10018
Tel.:  212.813.8800
Fax:  212.355.3333

Christine Dieter
Jaime A. Santos
GOODWIN PROCTER LLP
53 State Street
Boston, MA 02109-2802
Tel.:  617.570.1000
Fax:  617.523.1231

## STATEMENT REGARDING CONSENT TO FILE, AUTHORSHIP, AND MONETARY CONTRIBUTIONS

Appellant consents to the filing of this brief. Appellee has stated that it does not oppose Amici Curiae's motion for leave to file an amicus brief. Pursuant to Rule 29(c) of the Federal Rules of Appellate Procedure, Amici Curiae state that no counsel for a party authored this brief in whole or in part, and no counsel or party made a monetary contribution intended to fund the preparation or submission of this brief. No person other than Amici Curiae or their counsel made a monetary contribution to its preparation or submission.

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case.  In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form.  Counsel has a continuing duty to update this information.

No. _15-2056_        Caption: _G.G. v. Gloucester County School Board_

Pursuant to FRAP 26.1 and Local Rule 26.1,

_WORLD PROFESSIONAL ASSOCIATION FOR TRANSGENDER HEALTH_
(name of party/amicus)

_____

 who is _____amicus_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.      Is party/amicus a publicly held corporation or other publicly held entity?   ☐YES ☑NO

2.      Does party/amicus have any parent corporations?                    ☐YES ☑NO
        If yes, identify all parent corporations, including all generations of parent corporations:

3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                    ☐YES ☑NO
        If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?  ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐YES ☐NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

    N/A

6.  Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
    If yes, identify any trustee and the members of any creditors' committee:

Signature: _/s/ Thomas M. Hefferon_____    Date: _____10/28/15_____

Counsel for: _AMICI CURIAE_____

## CERTIFICATE OF SERVICE
**************************

I certify that on _____10/28/15_____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

Please see certificate of service at the end of the brief.

_/s/ Thomas M. Hefferon_____        _____10/28/15_____
         (signature)                                 (date)

- 2 -

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case.  In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form.  Counsel has a continuing duty to update this information.

No. __15-2056__        Caption: _G.G. v. Gloucester County School Board_____

Pursuant to FRAP 26.1 and Local Rule 26.1,

_PEDIATRIC ENDOCRINE SOCIETY_____
(name of party/amicus)

_____

 who is _____amicus_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.      Is party/amicus a publicly held corporation or other publicly held entity?   ☐YES ☑NO

2.      Does party/amicus have any parent corporations?                              ☐YES ☑NO
        If yes, identify all parent corporations, including all generations of parent corporations:

3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                                          ☐YES ☑NO
        If yes, identify all such owners:

4.   Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?   ☐ YES ☑ NO
If yes, identify entity and nature of interest:

5.   Is party a trade association? (amici curiae do not complete this question)   ☐ YES ☐ NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

N/A

6.   Does this case arise out of a bankruptcy proceeding?   ☐ YES ☑ NO
If yes, identify any trustee and the members of any creditors' committee:

Signature:  /s/ Thomas M. Hefferon                Date:        10/28/15

Counsel for:  AMICI CURIAE

## CERTIFICATE OF SERVICE
**************************

I certify that on _____10/28/15_____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

Please see certificate of service at the end of the brief.

/s/ Thomas M. Hefferon                              10/28/15
        (signature)                                   (date)

- 2 -

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. __15-2056__     Caption: __G.G. v. Gloucester County School Board__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__CHILD AND ADOLESCENT GENDER CENTER CLINIC AT UCSF BENIOFF CHILDREN'S HOSPITAL__
(name of party/amicus)

_____

 who is _____amicus_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.     Is party/amicus a publicly held corporation or other publicly held entity?  ☐YES ☑NO

2.     Does party/amicus have any parent corporations?                              ☐YES ☑NO
       If yes, identify all parent corporations, including all generations of parent corporations:

3.     Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or
       other publicly held entity?                                                  ☐YES ☑NO
       If yes, identify all such owners:

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))? ☐YES ☑NO
If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question) ☐YES ☐NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

 N/A

6. Does this case arise out of a bankruptcy proceeding? ☐YES ☑NO
If yes, identify any trustee and the members of any creditors' committee:

Signature: /s/ Thomas M. Hefferon _____     Date: _____10/28/15_____

Counsel for: AMICI CURIAE _____

# CERTIFICATE OF SERVICE
**************************

I certify that on _____10/28/15_____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

 Please see certificate of service at the end of the brief.

/s/ Thomas M. Hefferon _____          _____10/28/15_____
              (signature)                                    (date)

- 2 -

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. __15-2056__    Caption: __G.G. v. Gloucester County School Board__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__CENTER FOR TRANSYOUTH HEALTH AND DEVELOPMENT AT CHILDREN'S HOSPITAL LOS__
(name of party/amicus)

__ANGELES__

 who is _____amicus_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.      Is party/amicus a publicly held corporation or other publicly held entity?  ☐YES ☑NO

2.      Does party/amicus have any parent corporations?    ☐YES ☑NO
        If yes, identify all parent corporations, including all generations of parent corporations:

3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or
        other publicly held entity?                ☐YES ☑NO
        If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?    ☐YES ☑NO
If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☐YES ☐NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

N/A

6.    Does this case arise out of a bankruptcy proceeding?    ☐YES ☑NO
If yes, identify any trustee and the members of any creditors' committee:

Signature: /s/ Thomas M. Hefferon                    Date: 10/28/15

Counsel for: AMICI CURIAE

## CERTIFICATE OF SERVICE
*************************
I certify that on _____10/28/15_____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

Please see certificate of service at the end of the brief.

/s/ Thomas M. Hefferon                              10/28/15
(signature)                                          (date)

- 2 -

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. __15-2056__    Caption: __G.G. v. Gloucester County School Board__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__GENDER & SEX DEVELOPMENT PROGRAM AT ANN & ROBERT H. LURIE CHILDREN'S__
(name of party/amicus)

__HOSPITAL OF CHICAGO__

who is _____ amicus _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity? ☐ YES ☑ NO

2.    Does party/amicus have any parent corporations?    ☑ YES ☐ NO
      If yes, identify all parent corporations, including all generations of parent corporations:
      Children's Hospital of Chicago Medical Center

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO
      If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?    ☐YES ☑NO
If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☐YES ☐NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

  N/A

6.    Does this case arise out of a bankruptcy proceeding?    ☐YES ☑NO
If yes, identify any trustee and the members of any creditors' committee:

Signature: __/s/ Thomas M. Hefferon_____    Date: _____10/28/15_____

Counsel for: __AMICI CURIAE_____

# CERTIFICATE OF SERVICE
**************************

I certify that on _____10/28/15_____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

Please see certificate of service at the end of the brief.

__/s/ Thomas M. Hefferon_____      _____10/28/15_____
(signature)                                                  (date)

- 2 -

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case.  In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form.  Counsel has a continuing duty to update this information.

No. ___15-2056___     Caption: _G.G. v. Gloucester County School Board_____

Pursuant to FRAP 26.1 and Local Rule 26.1,

_FAN FREE CLINIC_____
(name of party/amicus)

_____

 who is _____amicus_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.      Is party/amicus a publicly held corporation or other publicly held entity?   ☐YES ☑NO

2.      Does party/amicus have any parent corporations?                          ☐YES ☑NO
        If yes, identify all parent corporations, including all generations of parent corporations:

3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or
        other publicly held entity?                                            ☐YES ☑NO
        If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?    ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)    ☐YES ☐NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

    N/A

6.  Does this case arise out of a bankruptcy proceeding?    ☐YES ☑NO
    If yes, identify any trustee and the members of any creditors' committee:

Signature: /s/ Thomas M. Hefferon _____    Date: _____10/28/15_____

Counsel for: AMICI CURIAE _____

# CERTIFICATE OF SERVICE
**************************

I certify that on _____10/28/15_____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

Please see certificate of service at the end of the brief.

/s/ Thomas M. Hefferon _____          _____10/28/15_____
          (signature)                                                    (date)

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case.  In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form.  Counsel has a continuing duty to update this information.

No. _15-2056___     Caption: _G.G. v. Gloucester County School Board_____

Pursuant to FRAP 26.1 and Local Rule 26.1,

_WHITMAN-WALKER CLINIC, INC., D/B/A WITMAN-WALKER HEALTH_____
(name of party/amicus)

_____

 who is _____amicus_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.      Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO

2.      Does party/amicus have any parent corporations?                    ☐ YES ☑ NO
        If yes, identify all parent corporations, including all generations of parent corporations:

3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or
        other publicly held entity?                                        ☐ YES ☑ NO
        If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?    ☐YES ☑NO
If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☐YES ☐NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

  N/A

6.    Does this case arise out of a bankruptcy proceeding?    ☐YES ☑NO
If yes, identify any trustee and the members of any creditors' committee:

Signature: __/s/ Thomas M. Hefferon_____    Date: _____10/28/15_____

Counsel for: __AMICI CURIAE_____

# CERTIFICATE OF SERVICE
**************************

I certify that on _____10/28/15_____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

 Please see certificate of service at the end of the brief.

__/s/ Thomas M. Hefferon_____                    _____10/28/15_____
            (signature)                                              (date)

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case.  In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form.  Counsel has a continuing duty to update this information.

No. __15-2056__    Caption: G.G. v. Gloucester County School Board

Pursuant to FRAP 26.1 and Local Rule 26.1,

GLMA: HEALTH PROFESSIONALS ADVANCING LGBT EQUALITY
(name of party/amicus)

who is _____amicus_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO

2.    Does party/amicus have any parent corporations?    ☐ YES ☑ NO
      If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO
      If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?  ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐YES ☐NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

    N/A

6.  Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
    If yes, identify any trustee and the members of any creditors' committee:

Signature: /s/ Thomas M. Hefferon                    Date: 10/28/15

Counsel for: AMICI CURIAE

## CERTIFICATE OF SERVICE
*************************

I certify that on _____10/28/15_____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

Please see certificate of service at the end of the brief.

/s/ Thomas M. Hefferon                                    10/28/15
(signature)                                               (date)

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case.  In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form.  Counsel has a continuing duty to update this information.

No. __15-2056__    Caption: _G.G. v. Gloucester County School Board_____

Pursuant to FRAP 26.1 and Local Rule 26.1,

_TRANSGENDER LAW & POLICY INSTITUTE_____
(name of party/amicus)

_____

 who is _____amicus_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.      Is party/amicus a publicly held corporation or other publicly held entity?   ☐YES ☑NO

2.      Does party/amicus have any parent corporations?                                      ☐YES ☑NO
        If yes, identify all parent corporations, including all generations of parent corporations:

3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or
        other publicly held entity?                                                                     ☐YES ☑NO
        If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?     ☐YES ☑NO
If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)   ☐YES ☐NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

 N/A

6.    Does this case arise out of a bankruptcy proceeding?     ☐YES ☑NO
If yes, identify any trustee and the members of any creditors' committee:

Signature: /s/ Thomas M. Hefferon _____     Date: _____10/28/15_____

Counsel for: AMICI CURIAE _____

# CERTIFICATE OF SERVICE
**************************

I certify that on _____10/28/15_____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

 Please see certificate of service at the end of the brief.

/s/ Thomas M. Hefferon _____                    _____10/28/15_____
        (signature)                                                                              (date)

# **TABLE OF CONTENTS**

**Page**

STATEMENT OF INTEREST OF AMICI ...............................................................1

ARGUMENT ........................................................................................................8

I.    Schools Play A Critical Role In The Development Of Healthy
      Children, And It Is Vitally Important For Schools To Support And
      Nurture Transgender Students' Development, As They Do For All
      Students................................................................................................11

    A.    All Adolescents Focus On Developing Their Individual Sense
      of Self. ...............................................................................................11

        i.    Like All Adolescents, Transgender Adolescents Strive To
      Develop A Healthy Identity. ......................................................12

        ii.   Social And Medical Support Are Essential For Many
      Transgender Students To Develop A Healthy Sense Of
      Self. ............................................................................................15

    B.    All Adolescents, Regardless Of Gender Identity, Are
      Vulnerable To The Effects Of Stigma And Isolation At School. .......21

        i.    Transgender Adolescents In Particular Are At Risk For
      Suffering The Negative Effects Of Stigma And
      Discrimination.............................................................................22

    C.    Schools Must Support Transgender Students By Affirming
      Their Gender Identity. .......................................................................25

        i.    School Policies Play An Important Role In Affirming
      Transgender Students' Identities. ...............................................25

        ii.   The Right To Use A Restroom At School That
      Corresponds With Their Gender Identity Is Crucial For
      Transgender Students, As It Is For All Students. .......................29

CONCLUSION ...................................................................................................31

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Coleman v. Zatechka*,
    824 F. Supp. 1360 (D. Neb. 1993)....................................................................29

*De'Lonta v. Johnson*,
    708 F.3d 520 (4th Cir. 2013) ...................................................... 18-19

*Doe v. Reg'l Sch. Unit 26*,
    86 A.3d 600 (Me. 2014)............................................................ 29-30

*Fields v. Smith*,
    712 F. Supp. 2d 830 (E.D. Wis. 2010) ...........................................19

*Huezo v. L.A. Cmty. Coll. Dist.*,
    No. CV04-9772MMM(JWJx), 2007 WL 7289347 (C.D. Cal. Feb.
    27, 2007) .........................................................................................29

*Snyder ex rel. R.P. v. Frankfort-Elberta Area Sch. Dist.*,
    No. 1:05-CV-824, 2006 WL 3613673 (W.D. Mich. Dec. 11, 2006) ...............29

*Soneeya v. Spencer*,
    851 F. Supp. 2d 228 (D. Mass. 2012).................................................9

**Statutes**

20 U.S.C. § 1681(a) .................................................................................27

**Other Authorities**

Am. Acad. of Child & Adolescent Psychiatry, *Your Adolescent* (David
    B. Pruitt ed., 1999)..........................................................................21

Am. Med. Ass'n House of Delegates, Resolution (A-08) *Removing
    Financial Barriers to Care for Transgender Patients* (2008) ...........................18

Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental
    Disorders* (5th ed. 2013)......................................................... 13, 15-16

ACTIVE/84075801.1

Am. Psychological Ass'n, *Answers to Your Questions About Transgender People, Gender Identity, and Gender Expression* (2014) ................................................................................ 13-14, 19

Am. Psychological Ass'n, *Developing Adolescents: A Reference for Professionals* (2002) .................................................................. 11-12

Am. Psychological Ass'n Task Force on Gen. Identity & Gen. Variance, *Report of the Task Force on Gender Identity and Gender Variance* (2008), *available at* https://www.apa.org/pi/lgbt/resources/policy/gender-identity-report.pdf.............................................................................................18

Arcadia Unified Sch. Dist., *Policy Bulletin: Transgender Students— Ensuring Equity and Nondiscrimination* (2015), *available at* http://www.nclrights.org/wp-content/uploads/2015/07/Transgender-Policy-Bulletin-Approved-w-corrections-April-2015.pdf..........................................................25

Judith Bradford et al., *Experiences of Transgender-Related Discrimination and Implications for Health: Results From the Virginia Transgender Health Initiative Study*, 103 Am. J. of Pub. Health 1820 (2013) .................................................. 22-23

Peggy Cohen-Kettenis et al., *The Treatment of Adolescent Transsexuals: Changing Insights*, 5 J. of Sexual Med. 1892 (2008) .4, 16, 18, 20

P.T. Cohen-Kettenis & L.J.G. Gooren, *Transsexualism: A Review of Etiology, Diagnosis and Treatment*, 46 J. of Psychosomatic Res. 315 (1999).................................................................... 14-15

Connecticut Safe Sch. Coal., *Guidelines for Connecticut Schools to Comply with Gender Identity and Expression Non-Discrimination Laws*, *available at* http://www.ct.gov/chro/lib/chro/Guidelines_for_Schools_on_Gender_Identity_and_Expression_final_4-24-12.pdf................................................26

District of Columbia Pub. Sch., *Transgender and Gender-Nonconforming Policy Guidance* (2015), *available at* http://dcps.dc.gov/sites/default/files/dc/sites/dcps/publication/attachments/DCPS%20Transgender%20Gender%20Non%20Conforming%20Policy%20Guidance.pdf............................................26

(iii)

Diane Ehrensaft, *From Gender Identity Disorder to Gender Identity Creativity: True Gender Self Child Therapy*, 59 J. of Homosexuality 337 (2012) ....................................................14, 19

Letter from James A. Ferg-Cadima, Acting Deputy Assistant Sec'y of Policy, Office for Civil Rights, U.S. Dep't of Educ. (Jan. 7, 2015), *available at* https://genderidentitywatch.files.wordpress.com/2014/11/28-2.pdf .................28

Bethany Gibson & Anita J. Catlin, *Care of the Child with the Desire to Change Gender – Part 1*, 36 Pediatric Nursing 53 (2010).....................*passim*

Catherine Good, Joshua Aronson & Michael Inzlicht, *Improving Adolescents' Standardized Test Performance: An Intervention to Reduce the Effects of Stereotype Threat*, 24 Applied Developmental Psychol. 645 (2003)........................................... 21-22

Jaime M. Grant, Lisa A. Mottet & Justin Tanis, *Injustice at Every Turn: A Report of the National Transgender Discrimination Survey* (2011), *available at* http://www.thetaskforce.org/static_html/downloads/reports/reports/ntds_full.pdf ...............................................................23, 25

Arnold H. Grossman & Anthony R. D'Augelli, *Transgender Youth and Life-Threatening Behaviors*, 37 Suicide & Life-Threatening Behav. 527 (2007)................................................16

Mark L. Hatzenbuehler, *How Does Minority Stigma "Get Under the Skin"? A Psychological Mediation Framework*, 135 Psychol. Bull. 707 (2009), *available at* http://www.ncbi.nlm.nih.gov/pmc/articles/PMC2789474/ ......................... 21-22

Wylie C. Hembree et al., *Endocrine Treatment of Transsexual Persons: An Endocrine Society Clinical Practice Guideline*, 94 J. of Clinical Endocrinology Metabolism 3132 (2009), *available at* http://press.endocrine.org/doi/full/10.1210/jc.2009-0345 ..................................18

Iowa Dep't of Educ., *Equality for Transgender Students (February 2015 School Leader Update)*, https://www.educateiowa.gov/resources/laws-and-regulations/legal-lessons/equality-transgender-students-february-2015-school (last visited Oct. 26, 2015)...........................................26

(iv)

ACTIVE/84075801.1

Eleanor E. Maccoby, *Gender and Group Process: A Developmental Perspective*, 11 Psychol. Sci. 54 (2002) ............................................................12

Laura Edwards-Leeper & Norman Spack, *Psychological Evaluation and Medical Treatment of Transgender Youth in an Interdisciplinary "Gender Management Service" (GEMS) in a Major Pediatric Center*, 59 J. of Homosexuality 321, 321-22, 327 (2012) ................................................................................................18

Gerald P. Mallon & Teresa DeCrescenzo, *Transgender Children and Youth: A Child Welfare Perspective*, Child Welfare, Mar.-Apr. 2006 ................................................................................................19

Massachusetts Dep't of Elementary & Secondary Educ., *Guidance of Massachusetts Public Schools Creating a Safe and Supportive School Environment: Nondiscrimination on the Basis of Gender Identity, available at* http://www.doe.mass.edu/ssce/GenderIdentity.pdf ...........................................26

Deana F. Morrow, *Social Work Practice with Gay, Lesbian, Bisexual, and Transgender Adolescents*, Fam. in Soc'y, Jan.-Mar. 2004 ................... 11-12

New York State Dep't of Educ., *Guidance to School Districts for Creating a Safe and Supportive Environment for Transgender and Gender Nonconforming Students* (2015), *available at* http://www.p12.nysed.gov/dignityact/documents/Transg_GNCGuidanceFINAL.pdf .......................................................... 26-27

Pub. Health Agency of Can., *Gender Identity in Schools: Questions and Answers* (2010), *available at* http://www.education.gov.sk.ca/Q-and-A-gender-identity ................... 13, 23-25

Caitlin Ryan et al., *Family Rejection as a Predictor of Negative Health Outcomes in White and Latino Lesbian, Gay, and Bisexual Young Adults*, 123 Pediatrics 346 (2009) ...........................................................24

Caitlin Ryan, *Supportive Families, Healthy Children: Helping Families with Lesbian, Gay, Bisexual, and Transgender Children* (2009), *available at* http://familyproject.sfsu.edu/sites/sites7.sfsu.edu.familyproject/files/FAP_English%20Booklet_pst.pdf ...........................................................13, 20

(v)

Karen Saeger, *Finding Our Way: Guiding a Young Transgender Child*, 2 J. of GLBT Family Studies 207 (2006) ................................................30

Norman P. Spack, *An Endocrine Perspective on the Care of Transgender Adolescents*, 13 J. of Gay & Lesbian Mental Health 309 (2009)................................................................................................ 14-15

Norman P. Spack et al., *Children and Adolescents with Gender Identity Disorder Referred to a Pediatric Medical Center*, 129 Pediatrics 418, 422-23 (2012)...........................................................16

Substance Abuse & Mental Health Servs. Admin., *Ending Conversion Therapy: Supporting and Affirming LGBTQ Youth* (2015), *available at* http://store.samhsa.gov/shin/content//SMA15-4928/SMA15-4928.pdf ................................................... 17-18, 28

Russell B. Toomey et al., *Gender-Nonconforming Lesbian, Gay, Bisexual, and Transgender Youth: School Victimization and Young Adult Psychosocial Adjustment*, 46 Developmental Psychol. 1580 (2010).........................................................................................13, 24

Pratyusha Tummala-Narra & Milena Claudius, *Perceived Discrimination & Depressive Symptoms Among Immigrant-Origin Adolescents*, 19 Cultural Diversity & Ethnic Minority Psychology 257 (2013)..........................................................................................22

U.S. Dep't of Educ., Office for Civil Rights, *Questions and Answers on Title IX & Sexual Violence* B-2 (2014), http://www2.ed.gov/about/offices/list/ocr/docs/qa-201401-title-ix-pdf ..............................................................................................27

U.S. Dep't of Educ., Office for Civil Rights, *Title IX Resources Guide*, *available at* https://www2.ed.gov/about/offices/list/ocr/docs/dcl-title-ix-coordinators-guide-201504.pdf .........................................................28

Washington Office of Superintendent of Pub. Instruction, *Students' Rights: Gender Expression and Gender Identity*, *available at* http://www.k12.wa.us/secondaryeducation/presentations/pubdocs/2015/GenderIdentity.pdf...................................................................26

Kathryn R. Wentzel & Kathryn Caldwell, *Friendships, Peer Acceptance, and Group Membership: Relations to Academic Achievement in Middle School*, 68 Child Dev. 1198 (1997) ................. 11-12, 22

David R. Williams, Harold W. Neighbors & James S. Jackson, *Racial/Ethnic Discrimination and Health: Findings from Community Studies*, 93 Am. J. of Pub. Health 200 (2003) ........................... 21-22

World Prof'l Ass'n for Transgender Health, *Standards of Care for the Health of Transsexual, Transgender, and Gender-Nonconforming People* (2012), *available at* http://www.wpath.org/uploaded_files/140/files/Standards%20of%2 0Care,%20V7%20Full%20Book.pdf ........................................................ 19-20

ACTIVE/84075801.1

## STATEMENT OF INTEREST OF AMICI CURIAE

Amici Curiae the World Professional Association for Transgender Health; Pediatric Endocrine Society; Child and Adolescent Gender Center Clinic at UCSF Benioff Children's Hospital; Center for Transyouth Health and Development at Children's Hospital Los Angeles; Gender & Sex Development Program at Ann & Robert H. Lurie Children's Hospital of Chicago; Fan Free Clinic; Whitman-Walker Clinic, Inc.; GLMA: Health Professionals Advancing LGBT Equality; Transgender Law and Policy Institute; Norman Spack, MD; and Michelle Forcier, MD, submit this Brief of Amici Curiae in support of Appellant G.

Amicus Curiae the World Professional Association for Transgender Health (WPATH), formerly known as the Harry Benjamin International Gender Dysphoria Association, is an international professional association with membership consisting of more than 900 physicians, psychologists, social scientists, and legal professionals committed to developing the best practices and supportive policies to promote health, research, education, respect, dignity, and equality for transgender people in all settings. WPATH develops and publishes the Standards of Care for the Health of Transsexual, Transgender, and Gender-Nonconforming People (Standards of Care), recognized in the medical community as the authoritative standards for the provision of transgender healthcare. The Standards of Care are informed by medical evidence and the current consensus in

medical research and clinical practice to provide treatment protocols specific to the nature and severity of an individual's condition. For over thirty years, the Standards of Care have emphasized the importance of social integration in an individual's gender role.

Amicus Curiae the Pediatric Endocrine Society (PES) has over 1,300 members representing the multiple disciplines of Pediatric Endocrinology. Consistent with the organization's mission, its members are dedicated to research and advancing the treatment of children with endocrine disorders. PES develops and publishes consensus documents that establish the standard of care for a wide range of endocrine disorders, as well as for conditions where endocrine treatments are a central component of care. In 2009, PES joined the Endocrine Society and other professional organizations to co-sponsor the creation of "Endocrine Treatment of Transsexual Persons: An Endocrine Society Clinical Practice Guideline," which, along with the WPATH Standards of Care, are the two standard-setting publications for the treatment of gender dysphoria.

Amicus Curiae the Child and Adolescent Gender Center (CAGC) at the UCSF Benioff Children's Hospital is a collaboration between UCSF and community organizations and offers comprehensive medical and psychological care, as well as advocacy and legal support, to gender non-conforming/transgender youth and adolescents. CAGC opened in May 2012 and currently serves over 250

2

patients, ranging in age from three to twenty-two. The healthcare team at CAGC provides consultation to other providers around the United States regarding affirming medical treatment and hormone therapy for transgender patients. Most recently, in 2015, Dr. Rosenthal, CAGC's Medical Director, together with three principal investigators were awarded a $6 million grant from the NIH for a longitudinal consortium study of transgender adolescents and young adults. Dr. Rosenthal is the Principal Investigator for the CAGC site.

Amicus Curiae the Center for Transyouth Health and Development at Children's Hospital Los Angeles promotes healthy futures for transgender youth by providing services, research, training, and capacity building that is developmentally informed, affirmative, compassionate, and holistic for gender nonconforming children and transgender youth. The Center is the largest clinic of its kind in the United States and is currently serving approximately 500 patients. The healthcare team at the Center provides consultation to other providers around the United States regarding affirming medical treatment and hormone therapy for transgender patients. Most recently, in 2015, Dr. Johanna Olson, the Center's Medical Director, together with three principal investigators were awarded a $6 million grant from the NIH for a longitudinal consortium study of transgender adolescents and young adults.

Amicus Curiae the Gender & Sex Development Program at the Ann &

ACTIVE/84075801.1

Robert H. Lurie Children's Hospital of Chicago offers medical and psychosocial
support for gender variant, gender nonconforming, and transgender children and
youth up to 21 years of age and their families. The clinic at Lurie Children's began
in 2012 and currently has nearly 300 patients. The healthcare team at Lurie
Children's also provides consultation and training for providers and organizations
interested in learning how to serve the needs of gender variant youth. Most
recently, in 2015, Dr. Garofalo, Medical Director for the clinic, together with three
principal investigators were awarded a $6 million grant from the NIH for a
longitudinal consortium study of transgender adolescents and young adults. Dr.
Garofalo is the Principal Investigator for the Lurie Children's site.

Amicus Curiae Fan Free Clinic was the first free clinic in Virginia and the
first healthcare organization with a transgender-specific clinic in the state. Its
mission is to provide quality health services, especially to those least served, in a
compassionate and non-judgmental environment. For over a decade, Fan Free
Clinic has been providing transgender patients with culturally competent services
including hormone treatment, referrals, and, more recently, assistance with legal
name and gender marker changes through its Trans Legal Collaborative. Fan Free
Clinic has heard countless stories of discrimination, oppression, and health issues
caused by being denied safe restroom access for hours while at school or work. Fan
Free Clinic has seen the importance of safe inclusive spaces in its clinic and other

public services and knows that a crucial health risk and safety risk is bathroom access as self-determined by the transgender individual.

Amicus Curiae Whitman-Walker Clinic, Inc., d/b/a Whitman-Walker Health (Whitman-Walker), is a nonprofit, community-based health organization serving the Washington, D.C. metropolitan area, including Northern Virginia. Whitman-Walker provides healthcare services for more than 14,000 individuals annually, including primary medical care; HIV and transgender specialty care; mental health and substance abuse treatment; dental care; nurse case management; legal services; and HIV and sexually transmitted infection testing, counseling, and prevention services. It is a national model for HIV care and healthcare for lesbian, gay, bisexual, and transgender persons. More than 900 of Whitman-Walker's healthcare patients identify as transgender. Whitman-Walker's Youth Services programs include mental health services for lesbian, gay, bisexual, transgender, and questioning teenagers and young adults who have been victims of violence; HIV prevention and treatment; and school-based, community-based, and family-based programs for sexual and reproductive health.

Amicus Curiae GLMA: Health Professionals Advancing LGBT Equality (GLMA, formerly known as the Gay & Lesbian Medical Association) is the largest and oldest association of lesbian, gay, bisexual, and transgender (LGBT) healthcare professionals, including physicians, nurses, psychologists, social

5

workers, and other health disciplines. GLMA's mission is to ensure equality in healthcare for LGBT individuals and healthcare professionals, using the medical and health expertise of GLMA members in public policy and advocacy, professional education, patient education and referrals, and the promotion of research. GLMA was founded in 1981 in part as a response to the call to advocate for policy and services to address the growing health crisis that would become the HIV/AIDS epidemic. Since then, GLMA's mission has broadened to address the full range of health issues affecting LGBT people, and GLMA has become a leader in public policy advocacy related to LGBT health.

Amicus Curiae the Transgender Law and Policy Institute is a non-profit organization dedicated to engaging in effective advocacy for transgender people in our society. The Transgender Law and Policy Institute brings experts and advocates together to work on law and policy initiatives designed to advance transgender equality.

Amicus Curiae Norman Spack, MD, is Senior Associate in the Endocrine Division at Boston Children's Hospital, where he has worked for 44 years, and Associate Clinical Professor of Pediatrics at Harvard Medical School. He is recognized internationally as an expert in transsexualism. In 2007, he co-founded Boston Children's Hospital's "Gender Management Service," an interdisciplinary clinic for Disorders of Sex Development and Transgenderism. At the time, it was

6

the only program of its kind outside of Europe and has since led to the development of 50 similar clinics in North America. Most recently, in 2015, Dr. Spack, together with three principal investigators, was awarded a $6 million grant from the NIH for a longitudinal consortium study of transgender adolescents and young adults. Dr. Spack is the Principal Investigator for the Boston Children's site.

Amicus Curiae Michelle Forcier, MD, is a physician in the Division of Adolescent Medicine at Rhode Island Hospital and Hasbro Children's Hospital. She provides primary and specialty adolescent medicine and pediatric care through the Young Adult Gender and Sexual Health Services as a faculty member at Brown University Department of Pediatrics, Medicine-Pediatrics, and through family medicine practice in Providence, Rhode Island. Dr. Forcier has served on the Rhode Island Lieutenant Governor's Committee on Public Health Policy and Practices since 2014, and on the Standing Committee of the AAMC Advisory Committee on Sexual Orientation, Gender Identity, and Sex Development since 2015. She has authored or co-authored nineteen peer-reviewed publications on adolescent development, including eight focused specifically on gender nonconforming children and adolescents. She regularly presents and teaches on issues relating to sexuality, gender nonconformance, and adolescent development.

The Amici Curiae have a substantial interest in this case as organizations and professionals dedicated to the health and wellbeing of transgender individuals

7

and, in particular, transgender children and adolescents. The promise of equal educational opportunity—as provided for under the Equal Protection Clause of the Fourteenth Amendment and Title IX—can be fulfilled for transgender students only if they are not treated differently than other youth because they are transgender and are able to live in full conformity with their gender identities. The principles set forth in this brief are well-established fundamental concepts of adolescent psychosocial development applied to the unique circumstances of individuals whose gender identity is different than their sex assigned at birth. For these individuals, normal psychological development and educational growth, including the critical ability to form peer relationships, requires that they affirm their gender identity in their lived experience. Most importantly for this case, this must include the ability to use the restroom consistent with their gender identity.

## ARGUMENT

This case involves a sixteen-year-old transgender boy, G., who has been excluded from using the restrooms used by all of the other boys at his high school. From a psychological and medical perspective, it is vitally important that G.'s school nurture and support his psychological, social, and educational development during the critical years of adolescence, as it does for all of its students. In G.'s case, that means, among other things, providing him access to the boys' restrooms at school in the same manner the school does for all the other boys.

8

During adolescence, all children undergo tremendous changes as each grapples with the physical, emotional, and social maturation that will propel them into adulthood. Forging a healthy, individual sense of self is a large part of what adolescence is all about. And, in turn, how an adolescent relates with his or her peers (or not) and interacts with authority figures, such as parents and teachers, becomes of paramount importance. These interactions help adolescents develop a sense of self-worth and an understanding of their place in the world.

Schools play a critical part in this process because transgender adolescents, like any adolescents, spend a significant portion of their time at school. Just as schools offer support to cultivate achievement, to assist students who may be struggling, and to provide a secure environment that fosters the development of positive relationships, schools cannot ignore the specific needs of transgender students or enact policies that isolate and marginalize them. For transgender students, being in a school that affirms and supports their gender identity is critical to ensuring that they too can experience adolescence in a healthy and constructive manner.

The psychological and medical community recognizes a professional consensus regarding the best way to support the development of healthy transgender adolescents, and schools play a crucial role in assuring that transgender adolescents receive this necessary support. A school that fails to

9

support its transgender students risks severely hampering their development and long-term wellbeing. Refusing to respect and affirm a transgender student's gender identity communicates a clear, negative message: there is something wrong with the student that warrants this unequal treatment. This message reaches the entire school community and often results in some students mirroring this mistreatment by harassing and abusing their transgender peers.

In this case, G.'s school initially recognized its crucial role and affirmed G.'s gender identity by treating him the same as other boys at the school with respect to access to the boys' restrooms. The school board's later-enacted policy at issue here directly undermines the school's critical support of G.: it demands that the school enforce stigmatizing and harmful mistreatment of G. by excluding him from the boys' restrooms and interfering with his educational opportunities. The policy signals to other students and the entire school community that, according to the school board, G. is not the same as the other boys at school and is not entitled to the same equal access to educational opportunities.

This case offers the Court the chance to remove a harmful and discriminatory barrier that has made it impossible for G. to learn and thrive. By doing so, this Court will confirm that transgender students are entitled to the same equal access to educational opportunities and equal treatment by school officials as all students. Amici Curiae respectfully request that this Court reverse the district

10

court's ruling, which allowed the school's discriminatory treatment of G. to

continue.

**I.    Schools Play A Critical Role In The Development Of Healthy Children, And It Is Vitally Important For Schools To Support And Nurture Transgender Students' Development, As They Do For All Students.**

**A.    All Adolescents Focus On Developing Their Individual Sense of Self.**

One of the most fundamental tasks of adolescence is the development of an

individual sense of self.[1] In developing that identity, adolescents shift their

attention and focus from their parents to their peer group, evaluating themselves

against their peers as they strive to fit in.[2] Adolescents spend tremendous effort

developing and maintaining relationships and cultivating a growing sense of how

to navigate social groups.[3]

Positive peer relationships in adolescence have long been linked to positive

psychosocial development, including better self-image and better school

performance, while lack of positive peer relationships correlates to less healthy

---

[1] Deana F. Morrow, *Social Work Practice with Gay, Lesbian, Bisexual, and Transgender Adolescents*, Fam. in Soc'y, Jan.-Mar. 2004, at 91.

[2] *Id.*

[3] Am. Psychological Ass'n, *Developing Adolescents: A Reference for Professionals* 21 (2002) [hereinafter *Developing Adolescents*], *available at* https://www.apa.org/pi/families/resources/develop.pdf; Kathryn R. Wentzel & Kathryn Caldwell, *Friendships, Peer Acceptance, and Group Membership: Relations to Academic Achievement in Middle School*, 68 Child Dev. 1198, 1199 (1997).

ACTIVE/84075801.1

psychosocial development.[4] Peer relationships, including friendships with
individuals of the same sex, play a key role in identity formation.[5] And schools, as
the place where adolescents spend most of their time, play a critical role in
fostering these relationships.[6] Indeed, schools are "the primary social setting in
which friends are made, social skills are learned, and self-efficacy is developed."
Deana F. Morrow, *Social Work Practice with Gay, Lesbian, Bisexual, and
Transgender Adolescents*, Fam. in Soc'y, Jan.-Mar. 2004, at 93. Simply put,
schools are "a central component in virtually every adolescent's life." *Id.*

      i.    *Like All Adolescents, Transgender Adolescents Strive To
Develop A Healthy Identity.*

Transgender adolescents, like all adolescents, need to develop a healthy
sense of self, peer relationships, and cognitive skills. Every day at school,
adolescents undertake the developmental task of forming their identity, by
interacting with their peers, evaluating the physical or social appearance they
present to others, and experiencing responses to a wide array of emotions. In order
for transgender students to focus on those important developmental tasks, they
must be able to attend school in a safe and supportive learning environment that

---

[4] Wentzel & Caldwell, *supra* note 3, at 1198; *see also Developing Adolescents*,
*supra* note 3, at 21.

[5] *Developing Adolescents*, *supra* note 3, at 21; Eleanor E. Maccoby, *Gender and
Group Process: A Developmental Perspective*, 11 Psychol. Sci. 54, 55 (2002).

[6] *Developing Adolescents*, *supra* note 3, at 24.

ACTIVE/84075801.1

affirms their gender identity.

Gender identity is not unique to transgender individuals. Everyone has a gender identity; it is a fundamental part of being human. Pub. Health Agency of Can., *Gender Identity in Schools: Questions and Answers* 1 (2010), *available at* http://www.education.gov.sk.ca/Q-and-A-gender-identity ("Gender is so fundamental to our identity, that without being aware of it, many aspects of human life are structured by and reveal our gender.").[7] The term "gender identity" refers to "the maleness and femaleness a person feels on the inside; how that identity is projected to the world; and how others mirror that identity back to the individual." Russell B. Toomey et al., *Gender-Nonconforming Lesbian, Gay, Bisexual, and Transgender Youth: School Victimization and Young Adult Psychosocial Adjustment*, 46 Developmental Psychol. 1580, 1581 (2010).[8] Although not all of the factors that contribute to the formation of one's gender identity are fully

---

[7] *See also* Caitlin Ryan, *Supportive Families, Healthy Children: Helping Families with Lesbian, Gay, Bisexual, & Transgender Children* 17 (2009), *available at* http://familyproject.sfsu.edu/sites/sites7.sfsu.edu.familyproject/files/FAP_English %20Booklet_pst.pdf.

[8] *See also* Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 451 (5th ed. 2013) [hereinafter *DSM-5*]; Am. Psychological Ass'n., *Answers to Your Questions About Transgender People, Gender Identity, and Gender Expression* 1 (2014) [hereinafter *APA Answers to Your Questions*], *available at* http://www.apa.org/topics/lgbt/transgender.pdf.

13

understood, it is generally accepted that gender identity has an innate component.[9] It is not simply a reflection of social gender norms and cultural ideas about what it means to be male or female, though these norms and ideas play a role.

Although every individual is assigned a sex at birth, this default assignment does not give any consideration to the individual's gender identity, which is not readily ascertainable at birth.[10] In most cases, sex assigned at birth and presumed gender identity are the same. But it is a mistake to assume—as many people have—that sex assigned at birth and gender identity are always the same. They are not. By the beginning of the twentieth century, researchers had already established that external genitalia alone—the critical criterion for assigning sex at birth—does not establish one's sex.[11] Instead, as research has come to show, an individual's sex depends primarily on gender identity. Other factors such as internal reproductive organs, external genitalia, chromosomes, hormones, and secondary-sex characteristics also play a role but are not nearly as important as gender identity in

[9] *APA Answers to Your Questions*, *supra* note 8, at 2; Peggy Cohen-Kettenis et al., *The Treatment of Adolescent Transsexuals: Changing Insights*, 5 J. of Sexual Med. 1892, 1895 (2008); Diane Ehrensaft, *From Gender Identity Disorder to Gender Identity Creativity: True Gender Self Child Therapy*, 59 J. of Homosexuality 337, 340-41 (2012).

[10] P.T. Cohen-Kettenis & L.J.G. Gooren, *Transsexualism: A Review of Etiology, Diagnosis and Treatment*, 46 J. of Psychosomatic Res. 315, 318 (1999); Norman P. Spack, *An Endocrine Perspective on the Care of Transgender Adolescents*, 13 J. of Gay & Lesbian Mental Health 309, 312-13 (2009).

[11] Cohen-Kettenis & Gooren, *supra* note 10, at 318.

ACTIVE/84075801.1

determining one's sex. *See* Norman P. Spack, *An Endocrine Perspective on the Care of Transgender Adolescents*, 13 J. of Gay & Lesbian Mental Health 309, 312-13 (2009) ("In other words, how can [a transgender girl] be a male to female if you really always were a female in your brain?"). [12]

For transgender individuals whose gender identity and sex assigned at birth do not align, being treated in accordance with sex assigned at birth causes tremendous pain and harm. Because most people's sex assigned at birth does align with their gender identity, they generally have no experience of the pain caused by treatment inconsistent with their gender identity. Ignoring transgender individuals' gender identities, the primary determinant of their sex, treats them profoundly differently than people whose sex assigned at birth aligns with their gender identity (all non-transgender individuals).

      ii.     *Social And Medical Support Are Essential For Many Transgender Students To Develop A Healthy Sense Of Self.*

The incongruence between an individual's gender identity and sex assigned at birth can manifest in clinically significant and disabling distress called "gender dysphoria." Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 451 (5th ed. 2013).[13] The distress can be exacerbated by external

---

[12] *See also* Cohen-Kettenis & Gooren, *supra* note 10, at 318; Spack, *supra* note 10, at 312-13.

[13] Contrary to popular misconception, the fact of being transgender is not itself a mental disorder.  It is only when the lack of alignment between one's gender

ACTIVE/84075801.1

influences, such as discrimination, stereotyping, and societal expectations, but it is the incongruence between one's physical body and internal gender identity that drives gender dysphoria.[14]

In particular, transgender children often become distressed by the approach or onset of puberty. Puberty initiates the development of secondary physical characteristics that differentiate men and women. Norman P. Spack, *An Endocrine Perspective on the Care of Transgender Adolescents*, 13 J. of Gay & Lesbian Mental Health, 309, 317 (2009) ("All the physical changes, including subtle changes like facial bone structure, that separate men and women in terms of appearance are pubertally-initiated."). The impending development of irreversible secondary-sex characteristics of the wrong sex can cause transgender adolescents tremendous psychological pain, often leading to depression, anorexia, social phobias, and suicidality.[15]

Fortunately, the distress that transgender individuals may experience can be

---

identity and sex assigned at birth causes manifest distress that gender dysphoria—which appears in the DSM—occurs. *DSM-5*, *supra* note 8, at 451-53.

[14] *DSM-5*, *supra* note 8, at 453; Arnold H. Grossman & Anthony R. D'Augelli, *Transgender Youth and Life-Threatening Behaviors*, 37 Suicide & Life-Threatening Behav. 527, 528 (2007); Norman P. Spack et al., *Children and Adolescents with Gender Identity Disorder Referred to a Pediatric Medical Center*, 129 Pediatrics 418, 422-23 (2012).

[15] Bethany Gibson & Anita J. Catlin, *Care of the Child with the Desire to Change Gender – Part 1*, 36 Pediatric Nursing 53, 54 (2010); *see also DSM-5*, *supra* note 8, at 454; Cohen-Kettenis et al., *supra* note 9, at 1894.

16

eased. Despite the district court's dismissal of G.'s medical expert's testimony as the opinion of just one doctor, JA 99-100,158, that expert's testimony reflected established medical consensus regarding the appropriate treatment and support for transgender individuals, including transgender adolescents. Such support seeks to alleviate the distress—gender dysphoria—that transgender individuals may experience. Appropriate treatment does not attempt to eliminate or realign an individual's gender identity, and past efforts to do so have caused individuals extraordinary harm and anguish. Substance Abuse & Mental Health Servs. Admin., *Ending Conversion Therapy: Supporting and Affirming LGBTQ Youth* 1 (2015), *available at* http://store.samhsa.gov/shin/content//SMA15-4928/SMA15-4928.pdf ("[C]onversion therapy—efforts to change an individual's sexual orientation, gender identity or gender expression—is a practice that is not supported by credible evidence and has been disavowed by behavioral health experts and associations."). Instead, proper support focuses on bringing the body into alignment with an individual's gender identity.

According to the established medical consensus, the only effective treatment for the disabling experience of gender dysphoria is the provision of medical and social support for gender transition and, thus, the affirmation of the individual's gender identity. *See* JA 37-38 (Corrected Expert Declaration of Randi Ettner, Ph.D.) Through the process of gender transition, an individual brings his or her

body into alignment with his or her gender identity. The protocol for gender

transition is well-established and highly effective.[16] That protocol is codified in the

Standards of Care, developed by the World Professional Association for

Transgender Health (WPATH). The Standards of Care are broadly recognized as

the acceptable and appropriate treatment for gender dysphoria.[17]

---

[16] Substance Abuse & Mental Health Servs. Admin., *Ending Conversion Therapy: Supporting and Affirming LGBTQ Youth* 48-49 (2015) [hereinafter *Ending Conversion Therapy*], *available at* http://store.samhsa.gov/shin/content//SMA15-4928/SMA15-4928.pdf; Cohen-Kettenis et al., *supra* note 9, at 1893; Laura Edwards-Leeper & Norman Spack, *Psychological Evaluation and Medical Treatment of Transgender Youth in an Interdisciplinary "Gender Management Service" (GEMS) in a Major Pediatric Center*, 59 J. of Homosexuality 321, 321-22, 327 (2012).

[17] Am. Med. Ass'n House of Delegates, Resolution 122 (A-08) *Removing Financial Barriers to Care for Transgender Patients* 1 (2008) ("The World Professional Association for Transgender Health, Inc. ("WPATH") is the leading international, interdisciplinary professional organization devoted to the understanding and treatment of gender identity disorders, and has established internationally accepted Standards of Care for providing medical treatment for people with GID [that] are recognized within the medical community to be the standard of care for treating people with GID."); Am. Psychological Ass'n Task Force on Gen. Identity & Gen. Variance, *Report of the Task Force on Gender Identity and Gender Variance* 32 (2008), *available at* https://www.apa.org/pi/lgbt/resources/policy/gender-identity-report.pdf ("The *Standards of Care* reflects the consensus in expert opinion among professionals in this field on the basis of their collective clinical experience as well as a large body of outcome research . . . ."); Wylie C. Hembree et al., *Endocrine Treatment of Transsexual Persons: An Endocrine Society Clinical Practice Guideline*, 94 J. of Clinical Endocrinology Metabolism 3132 (2009), *available at* http://press.endocrine.org/doi/full/10.1210/jc.2009-0345 (identifying the Standards of Care as "carefully prepared documents [that] have provided mental health and medical professionals with general guidelines for the evaluation and treatment of transsexual persons"); *see also, e.g.*, *De'Lonta v. Johnson*, 708 F.3d 520, 522-23

ACTIVE/84075801.1

Under the Standards of Care, support for transgender individuals consists of an individualized protocol that can include psychotherapy support and counseling, support for social role transition, hormone therapy (including hormone blockers), and a range of confirming surgeries. World Prof'l Ass'n for Transgender Health, *Standards of Care for the Health of Transsexual, Transgender, and Gender-Nonconforming People* (2012), *available at* http://www.wpath.org/uploaded_files/140/files/Standards%20of%20Care,%20V7%20Full%20Book.pdf.[18] Through social role transition, transgender adolescents come to live all aspects of their lives consistently with their gender identity.[19] Under the Standards of Care, transgender adolescents may also be eligible for medications that delay the onset of puberty and, thus, the development of the

---

(4th Cir. 2013) ("The Standards of Care, published by the World Professional Association for Transgender Health, are the generally accepted protocols for the treatment of GID [gender dysphoria]"); *Soneeya v. Spencer*, 851 F. Supp. 2d 228, 231 (D. Mass. 2012) ("The course of treatment for Gender Identity Disorder generally followed in the community is governed by the 'Standards of Care' promulgated by the World Professional Association for Transgender Health ('WPATH')."); *Fields v. Smith*, 712 F. Supp. 2d 830, 838 n.2 (E.D. Wis. 2010) (accepting WPATH's Standards of Care as "the worldwide acceptable protocol for treating GID [gender dysphoria]"), *aff'd* 653 F.3d 550 (7th Cir. 2011).

[18] *See also APA Answers to Your Questions*, *supra* note 8, at 3; Gibson & Catlin, *supra* note 15, at 55.

[19] Ehrensaft, *supra* note 9, at 338, 353; Gerald P. Mallon & Teresa DeCrescenzo, *Transgender Children and Youth: A Child Welfare Perspective*, Child Welfare, Mar.-Apr. 2006, at 215, 225.

ACTIVE/84075801.1

wrong secondary-sex characteristics.[20] This hormone treatment may be combined with feminizing/masculinizing hormone therapy, which leads to the development of secondary-sex characteristics consistent with the adolescent's gender identity.[21] When transgender individuals, including transgender adolescents, are supported and affirmed in their gender identity in the manner contemplated by the Standards of Care, they thrive psychologically and socially.[22]

The support that G. has received to date, as prescribed by his psychologist who is experienced in working with transgender youth, is entirely consistent with the Standards of Care and allows G. to lead a healthy life. G.'s parents supported his transition to living as a boy in all aspects of his life. JA 29-31. G. changed his legal name to a male name, and the sex designation on his state-issued identification card identifies him as male. *Id.* at 29, 60. As contemplated by the Standards of Care, G. began masculinizing hormone therapy in December 2014, which has deepened his voice, increased his facial hair, and given him an overall masculine appearance consistent with his male identity. *Id.* at 30.

In other words, medically, psychologically, and socially, G. is a boy. When

---

[20] World Prof'l Ass'n for Transgender Health, *Standards of Care for the Health of Transsexual, Transgender, and Gender-Nonconforming People* 18-19 (2012) [hereinafter SOC], *available at* http://www.wpath.org/uploaded_files/140/files/Standards%20of%20Care,%20V7%20Full%20Book.pdf; Cohen-Kettenis et al., *supra* note 10, at 1894.

[21] SOC, *supra* note 20, at 20.

[22] Ryan, *supra* note 7, at 17.

ACTIVE/84075801.1

his school treats him differently than the other boys, it denies this reality by stigmatizing him and inflicting real harm. G. does not require special treatment at school; he simply needs to be recognized as the boy that he is and treated by the school like any other boy.

### B.   All Adolescents, Regardless Of Gender Identity, Are Vulnerable To The Effects Of Stigma And Isolation At School.

"For all their bravado, young adolescents are rather delicate from a psychological viewpoint." Am. Acad. of Child & Adolescent Psychiatry, *Your Adolescent* 7 (David B. Pruitt ed.,1999). They are particularly vulnerable to the effects of stressful events and discrimination of all kinds.[23] Because the opinions of their peers take on such paramount importance, any slight, exclusion, or differential treatment can have tremendous and long-lasting psychological repercussions. *See id.*

Numerous studies have demonstrated that children who are isolated or lack positive peer relationships are emotionally vulnerable, lack self-esteem, and may

---

[23] Catherine Good, Joshua Aronson & Michael Inzlicht, *Improving Adolescents' Standardized Test Performance: An Intervention to Reduce the Effects of Stereotype Threat*, 24 Applied Developmental Psychol. 645, 647 (2003); Mark L. Hatzenbuehler, *How Does Minority Stigma "Get Under the Skin"? A Psychological Mediation Framework*, 135 Psychol. Bull. 707, 726 (2009), *available at* http://www.ncbi.nlm.nih.gov/pmc/articles/PMC2789474/; David R. Williams, Harold W. Neighbors & James S. Jackson, *Racial/Ethnic Discrimination and Health: Findings from Community Studies*, 93 Am. J. of Pub. Health 200, 200, 202 (2003).

ACTIVE/84075801.1

have poorer academic performance.[24] Isolation can lower children's perception of their self-worth.[25] Stereotypes and stigma in particular often lead to poorer academic performance. Catherine Good, Joshua Aronson & Michael Inzlicht, *Improving Adolescents' Standardized Test Performance: An Intervention to Reduce the Effects of Stereotype Threat*, 24 Applied Developmental Psychol. 645, 647 (2003) ("[Stigma] can undermine the academic performance of females in math, students from low socioeconomic backgrounds and, in fact, any group that contends with negative stereotypes about their intellectual abilities.").[26] They have also been linked repeatedly to poorer mental and physical health.[27]

      i.     *Transgender Adolescents In Particular Are At Risk For Suffering The Negative Effects Of Stigma And Discrimination.*

Transgender individuals have historically suffered significant discrimination and stereotyping. A recent survey of transgender individuals living in Virginia, for example, found that these individuals experienced very high rates of discrimination. Judith Bradford et al., *Experiences of Transgender-Related Discrimination and Implications for Health: Results from the Virginia*

---

[24] *See, e.g.*, Wentzel & Caldwell, *supra* note 3, at 1199.

[25] *Id.*

[26] *See also* Hatzenbuehler, *supra* note 23, at 714.

[27] Pratyusha Tummala-Narra & Milena Claudius, *Perceived Discrimination & Depressive Symptoms Among Immigrant-Origin Adolescents*, 19 Cultural Diversity & Ethnic Minority Psychol. 257, 260 (2013); Williams, Neighbors & Jackson, *supra* note 23, at 200, 202.

ACTIVE/84075801.1

*Transgender Health Initiative Study*, 103 Am. J. of Pub. Health 1820, 1826-27 (2013). Almost 50% of survey participants reported that they had experienced discrimination in healthcare, employment, or housing, and many individuals had experienced discrimination in more than one area. *Id.* at 1825. The survey also found that individuals who became aware of being transgender at an earlier age faced greater discrimination. *Id.* Over one-third of participants had negative experiences in high school, "including experiencing hostility from peers, teachers, or school administrators." *Id.*

This historical and continuing discrimination makes transgender students particularly vulnerable to the effects of stigma at school. Transgender students continue to face high rates of physical and verbal harassment in educational settings. Jaime M. Grant, Lisa A. Mottet & Justin Tanis, *Injustice at Every Turn: A Report of the National Transgender Discrimination Survey* 3 (2011), *available at* http://www.thetaskforce.org/static_html/downloads/reports/reports/ntds_full.pdf. ("Those who expressed a transgender identity or gender non-conformity while in grades K-12 reported alarming rates of harassment (78%), physical assault (35%) and sexual violence (12%); harassment was so severe that it led almost one-sixth (15%) to leave a school in K-12 settings or in higher education."); Pub. Health Agency of Can., *Gender Identity in Schools: Questions and Answers* 4 (2010) ("Studies suggest that in the school setting, as many as 96% of gender variant

23

youth are verbally harassed and as many as 83% physically harassed. As a result, as many as three-quarters of gender variant youth report not feeling safe in school and three out of four report dropping out.").

Transgender students are also at risk for low self-esteem and depression, which can in turn lead to poor psychosocial adjustment and increased risk of suicidality over time.[28] Indeed, studies have reported that 83% of transgender youth have experienced thoughts of suicide and 54% have attempted suicide.[29] The stigma that often attaches to transgender individuals can be acute and extraordinarily harmful.

To facilitate the development of positive self-image and long-term mental and physical wellbeing, adolescents (including transgender adolescents) need protection from stigma and affirmation of their identities. Because schools occupy such a key space in adolescents' lives, they have a particularly important responsibility for supporting adolescent development.

---

[28] Pub. Health Agency of Can., *Gender Identity in Schools: Questions and Answers* 4-5 (2010), *available at* http://www.education.gov.sk.ca/Q-and-A-gender-identity; Caitlin Ryan et al., *Family Rejection as a Predictor of Negative Health Outcomes in White and Latino Lesbian, Gay, and Bisexual Young Adults*, 123 Pediatrics 346, 346 (2009); Russell B. Toomey et al., *Gender-Nonconforming Lesbian, Gay, Bisexual, and Transgender Youth: School Victimization and Young Adult Psychosocial Adjustment*, 46 Developmental Psychol. 1580, 1581 (2010).

[29] Gibson & Catlin, *supra* note 15, at 53-59.

ACTIVE/84075801.1

**C.      Schools Must Support Transgender Students By Affirming Their Gender Identity.**

The central position of schools, administrators, and teachers in adolescents' lives uniquely positions them to either reinforce stigma or dismantle it. When teachers and administrators enforce policies of stigmatization, transgender students suffer.[30] Schools must combat the hostilities that transgender students may face and affirm their gender identity in all aspects of school life.

> i.      *School Policies Play An Important Role In Affirming Transgender Students' Identities.*

Recognizing the extraordinary influence of teachers and administrators in the development of healthy transgender adolescents, numerous states and school districts have adopted policies supportive of transgender students. For example, California's Arcadia Unified School District's policy, which has been endorsed by the U.S. Department of Education's Office for Civil Rights and the U.S. Department of Justice's Civil Rights Division, provides that "[s]tudents shall have access to restrooms that correspond to their gender identity asserted at school." Arcadia Unified Sch. Dist., *Policy Bulletin: Transgender Students—Ensuring Equity and Nondiscrimination* 4 (2015), *available at* http://www.nclrights.org/wp-

---

[30] Pub. Health Agency of Can., *supra* note 28, at 11; *see also* Jaime M. Grant, Lisa A. Mottet & Justin Tanis, *Injustice at Every Turn: A Report of the National Transgender Discrimination Survey* 3 (2011), *available at* http://www.thetaskforce.org/static_html/downloads/reports/reports/ntds_full.pdf; Morrow, *supra* note 1, at 93.

ACTIVE/84075801.1

content/uploads/2015/07/Transgender-Policy-Bulletin-Approved-w-corrections-

April-2015.pdf. The states of Connecticut, Iowa, Massachusetts, New York, and

Washington, along with the District of Columbia, all have similar policies.[31] These

---

[31] Connecticut Safe Sch. Coal., *Guidelines for Connecticut Schools to Comply with Gender Identity and Expression Non-Discrimination Laws* 7-8, *available at* http://www.ct.gov/chro/lib/chro/Guidelines_for_Schools_on_Gender_Identity_and _Expression_final_4-24-12.pdf ("Students should have access to the restroom that corresponds to their gender identity asserted at school."); District of Columbia Pub. Sch., *Transgender and Gender-Nonconforming Policy Guidance* 9 (2015), *available at* http://dcps.dc.gov/sites/default/files/dc/sites/dcps/publication/attachments/DCPS% 20Transgender%20Gender%20Non%20Conforming%20Policy%20Guidance.pdf ("[T]ransgender and gender-nonconforming students are entitled to use the bathroom that matches their gender identity."); Iowa Dep't of Educ., *Equality for Transgender Students (February 2015 School Leader Update)*, https://www.educateiowa.gov/resources/laws-and-regulations/legal-lessons/equality-transgender-students-february-2015-school (last visited Oct. 26, 2015) ("Absent a concern for safety, schools should permit a student to use the restrooms or locker rooms for which they identify with."); Massachusetts Dep't of Elementary & Secondary Educ., *Guidance of Massachusetts Public Schools Creating a Safe and Supportive School Environment: Nondiscrimination on the Basis of Gender Identity* 9, *available at* http://www.doe.mass.edu/ssce/GenderIdentity.pdf ("In all cases, the principal should be clear with the student (and parent) that the student may access the restroom, locker room, and changing facility that corresponds to the student's gender identity."); New York State Dep't of Educ., *Guidance to School Districts for Creating a Safe and Supportive Environment for Transgender and Gender Nonconforming Students* 9-10 (2015), *available at* http://www.p12.nysed.gov/dignityact/documents/Transg_GNCGuidanceFINAL.pd f ("[P]rohibiting a student from accessing the restrooms that match his gender identity is prohibited sex discrimination."); Washington Office of Superintendent of Pub. Instruction, *Students' Rights: Gender Expression and Gender Identity* 2, *available at* http://www.k12.wa.us/secondaryeducation/presentations/pubdocs/2015/GenderIde ntity.pdf ("Public schools must allow students to use the restroom that corresponds to their gender identity.").

26

policies reference single-stall or non-communal use facilities only as options when desired by a student—any student—and never as a forced alternative. *See, e.g.*, New York State Dep't of Educ., *Guidance to School Districts for Creating a Safe and Supportive Environment for Transgender and Gender Nonconforming Students* 9-10 (2015), *available at* http://www.p12.nysed.gov/dignityact/documents/Transg_GNCGuidanceFINAL.pdf ("Alternative accommodations, such as a single 'unisex' bathroom or private changing space, should be made available to students who request them **but should never be forced upon students**, nor presented as the only option." (emphasis added)).

Title IX also serves to safeguard the healthy development of transgender students and ensure their equal access to educational opportunities. It prohibits recipients of federal financial assistance from discriminating on the basis of sex, which includes gender identity.[32] The U.S. Department of Education Office for Civil Rights has explained that Title IX's prohibition on sex discrimination protects transgender students. Title IX thus requires schools to prohibit

---

[32] Title IX provides that, "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ." 20 U.S.C. § 1681(a); *see also* U.S. Dep't of Educ., Office for Civil Rights, *Questions and Answers on Title IX and Sexual Violence* B-2 (2014), *available at* http://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf.

ACTIVE/84075801.1

discrimination against transgender students at school, respecting their gender

identities and promoting their wellbeing in a manner consistent with the

established medical consensus.

For example, the Office for Civil Rights has stated that a school "must treat

transgender students consistent with their gender identity." Letter from James A.

Ferg-Cadima, Acting Deputy Assistant Sec'y of Policy, Office for Civil Rights,

U.S. Dep't of Educ. (Jan. 7, 2015) ), *available at*

https://genderidentitywatch.files.wordpress.com/2014/11/28-2.pdf.[33] In response to

recent investigations by the Office for Civil Rights, at least two schools have

revised their policies "to make clear that transgender students should be treated

consistent with their gender identity for purposes of restroom access." *Id.*

Additionally, the Department of Education's Title IX Resources Guide provides

that transgender students should be "treated consistent with their gender identity in

the context of single-sex classes." U.S. Dep't of Educ., Office for Civil Rights,

*Title IX Resources Guide* 22 (2015), *available at*

https://www2.ed.gov/about/offices/list/ocr/docs/dcl-title-ix-coordinators-guide-

201504.pdf. The Department of Education's position is consistent with the well-

established medical consensus that transgender adolescents require affirmation of

---

[33] *Accord Ending Conversation Therapy*, *supra* note 16, at 44 ("Students should
never be asked to change gender non-conforming behavior as a means of resolving
issues arising in school.").

their gender identity in all aspects of their lives.

      ii.    *The Right To Use A Restroom At School That Corresponds With Their Gender Identity Is Crucial For Transgender Students, As It Is For All Students.*

Any student isolated in a separate restroom would feel stigmatized and harmed. *Cf. Huezo v. L.A. Cmty. Coll. Dist.*, No. CV04-9772MMM(JWJx), 2007 WL 7289347, at *8-9 (C.D. Cal. Feb. 27, 2007) (lack of support for student with disability resulted in student becoming "the focus of unwanted attention" and being "dissuaded from taking a class altogether"); *Coleman v. Zatechka*, 824 F. Supp. 1360, 1373 (D. Neb. 1993) ("[T]he university's policy at issue here of excluding plaintiff from the roommate assignment program . . . sanctions the attitude that students with disabilities are less desirable and suggests that others should not be required to live with them."). The same is true for transgender students. *See Doe v. Reg'l Sch. Unit 26*, 86 A.3d 600, 606 (Me. 2014) ("[I]n keeping with the information provided to the school by Susan's family, her therapists, and experts in the field of transgender children, the school determined that Susan should use the girls' bathroom[,] . . . provid[ing] her with the same access to public facilities that it provided other girls."); *cf. Snyder ex rel. R.P. v. Frankfort-Elberta Area Sch. Dist.*, No. 1:05-CV-824, 2006 WL 3613673, at *1-2 (W.D. Mich. Dec. 11, 2006) (concluding that exclusion of African American student from regular school restrooms in response to harassment from other students could constitute race

29

discrimination).

Forcing a transgender boy to use a separate restroom serves as a constant reminder that the school views him as different from all of the other boys at the school. In fact, in G.'s case, G. has found using a separate restroom so stigmatizing that he has allowed himself to become ill rather than use the separate facility. JA 32-34; *see also* Karen Saeger, *Finding Our Way: Guiding a Young Transgender Child*, 2 J. of GLBT Family Studies 207, 235 (2006) ("For months [the transgender boy] was uncomfortable using even the unisex bathroom, which was far from the classroom, preferring to wet himself instead.").

G.'s school itself recognizes G. as a boy whose educational needs require support for his gender identity in all aspects of his school environment, including restroom use. JA 30. Indeed, the school allowed G. to use the boys' restroom for seven weeks before the policy adopted by the community-constituted school board took effect. *Id.* at 31; *see also Doe*, 86 A.3d at 606 ("[The school's] later decision to ban Susan from the girls' bathroom, based not on a determination that there had been some change in Susan's status but on others' complaints about the school's well-considered decision, constituted discrimination . . . ."). Relegating G. to a separate, single-stall restroom after this period of use conflicted with the support that his mental health provider and the school identified as essential to his academic and social achievement.

## **CONCLUSION**

All adolescents must undertake the significant and life-long task of developing a sense of self. Schools, as a primary locus for peer relationships and social bonding, have a critical role to play in supporting healthy adolescent development. This applies equally to all students, including transgender students. Providing appropriate support to transgender students requires affirming their gender identity in all aspects of school life, including their use of restrooms. Otherwise, transgender students experience stigmatizing and isolating treatment that places their wellbeing in jeopardy.

The school board policy at issue in this case contradicts the clear medical consensus on the appropriate support for transgender adolescents and undermines the school's support of G. by enforcing stigmatizing and harmful mistreatment. Amici curiae therefore urge this Court to reverse the district court's ruling.

Respectfully submitted,

By their attorneys,

/s/ Thomas M. Hefferon
Thomas M. Hefferon
GOODWIN PROCTER LLP
901 New York Avenue NW
Washington, DC  20001
Tel.:  202.346.4000
Fax:  202.346.4444

Jennifer Levi
Gay & Lesbian Advocates &
  Defenders
30 Winter Street, Ste 800
Boston, MA 02108
Tel.: 617.426.1350

31

Shannon Minter                          Mary K. Dulka
Asaf Orr                                GOODWIN PROCTER LLP
National Center for Lesbian Rights      620 Eighth Avenue
870 Market Street, Ste 370              New York, NY 10018
San Francisco, CA 94102                 Tel.:  212.813.8800
Tel.: 415.392.6257                      Fax:  212.355.3333

                                        Christine Dieter
                                        Jaime A. Santos
                                        GOODWIN PROCTER LLP
                                        53 State Street
                                        Boston, MA 02109-2802
                                        Tel.:  617.570.1000
                                        Fax:  617.523.1231

Dated:        October 28, 2015

ACTIVE/84075801.1

## AMICI CURIAE'S CERTIFICATE OF COMPLIANCE

The undersigned, Thomas M. Hefferon, counsel for Amici Curiae, hereby certifies pursuant to Fed. R. App. P. 32(a)(7)(C) that the Brief of Amici Curiae complies with the type-volume limitations of F.R.A.P. 32(a)(7)(B). According to the word count of Word for Windows, the word-processing system used to prepare the brief, the brief contains 7,056 words.

I further certify that the foregoing brief complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface in 14-point Times New Roman font.


Dated:        October 28, 2015              Respectfully submitted,


                                            /s/ Thomas M. Hefferon
                                            Thomas M. Hefferon

ACTIVE/84075801.1

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 28, 2015, I electronically filed the foregoing document with the United States Court of Appeals for the Fourth Circuit by using the CM/ECF system. I certify that the following parties or their counsel of record are registered as ECF Filers and that they will be served by the CM/ECF system:

| | |
|---|---|
| Joshua A. Block<br>Direct: 212-549-2593<br>Email: jblock@aclu.org<br>Leslie Cooper<br>Direct: 212-549-2627<br>Email: LCooper@aclu.org<br>AMERICAN CIVIL LIBERTIES UNION<br>18th Floor<br>125 Broad Street<br>New York, NY 10004-2400<br><br>Counsel for Plaintiff - Appellant<br>G. G., by his next friend and mother, Deirdre Grimm | Gail Marie Deady<br>Direct: 804-523-2154<br>Email: gdeady@acluva.org<br>Rebecca Kim Glenberg<br>Direct: 804-644-8080<br>Email: rglenberg@acluva.org<br>AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF VIRGINIA<br>Suite 1412<br>701 East Franklin Street<br>Richmond, VA 23219-0000<br><br>Counsel for Plaintiff - Appellant<br>G. G., by his next friend and mother, Deirdre Grimm |
| Jeremy David Capps<br>Direct: 804-762-8030<br>Email: jcapps@hccw.com<br>David Patrick Corrigan<br>Direct: 804-747-5200<br>Email: dcorrigan@hccw.com<br>Maurice Scott Fisher, Jr.<br>Direct: 804-622-1150<br>Email: sfisher@hccw.com<br>HARMAN, CLAYTOR, CORRIGAN & WELLMAN<br>P. O. Box 70280<br>Richmond, VA 23255-0000<br><br>Counsel for Defendant - Appellee<br>GLOUCESTER CNTY. SCHOOL BD. | |

ACTIVE/84075801.1

| | |
|---|---|
| Victoria Lill<br>Direct: 202-514-4092<br>Email: victoria.lill@usdoj.gov<br>U. S. DEPARTMENT OF JUSTICE<br>Ed Opportunities<br>950 Pennsylvania Avenue, NW<br>Washington, DC 20530 | Clare Patricia Wuerker<br>Direct: 757-441-6361<br>Email: clare.wuerker@usdoj.gov<br>OFFICE OF THE UNITED STATES<br>ATTORNEY<br>8000 World Trade Center<br>101 West Main Street, Suite 8000<br>Norfolk, VA 23510-1624 |

/s/ Thomas M. Hefferon
Thomas M. Hefferon

35

ACTIVE/84075801.1