No. 15-2056

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT
_____

G.G., by his next friend and mother DEIRDRE GRIMM,

Plaintiff-Appellant

v.

GLOUCESTER COUNTY SCHOOL BOARD,

Defendant-Appellee
_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
_____

BRIEF FOR THE UNITED STATES AS *AMICUS CURIAE* SUPPORTING
PLAINTIFF-APPELLANT AND URGING REVERSAL
_____

JAMES COLE, JR.
 General Counsel

FRANCISCO LOPEZ
VANESSA SANTOS
MICHELLE TUCKER
 Attorneys
 U.S. Department of Education
 Office of the General Counsel

GREGORY B. FRIEL
 Deputy Assistant Attorney General

DIANA K. FLYNN
SHARON M. MCGOWAN
CHRISTINE A. MONTA
 Attorneys
 U.S. Department of Justice
 Civil Rights Division
 Appellate Section – RFK 3730
 Ben Franklin Station
 P.O. Box 14403
 Washington, DC 20044-4403
 (202) 353-9035

# TABLE OF CONTENTS

**PAGE**

INTEREST OF THE UNITED STATES ..................................................................1

STATEMENT OF THE ISSUES..........................................................................2

STATEMENT OF THE CASE.............................................................................3

    *1.*     *Background* .............................................................................3

    *2.*     *Statement Of Facts* .................................................................5

    *3.*     *Procedural History*.................................................................7

ARGUMENT

    WHERE A SCHOOL PROVIDES SEPARATE RESTROOMS
    FOR BOYS AND GIRLS, BARRING A STUDENT FROM
    THE RESTROOMS THAT CORRESPOND TO HIS OR HER
    GENDER IDENTITY BECAUSE THE STUDENT IS
    TRANSGENDER CONSTITUTES UNLAWFUL SEX
    DISCRIMINATION UNDER TITLE IX........................................................8

        *A.*     *GCSB's Restroom Policy Violates Title IX*...............................8

            *1.*     *Treating A Transgender Student Differently
                  From Other Students Because He Is
                  Transgender Constitutes Differential
                  Treatment On The Basis Of Sex*.......................................9

            *2.*     *Where A School Provides Sex-Segregated
                  Restrooms, Denying A Student Access To
                  The Restrooms Consistent With His Or Her
                  Gender Identity Denies That Student Equal
                  Educational Opportunity* .................................................14

**TABLE OF CONTENTS (continued):**                    **PAGE**

3.    *General Invocations Of Privacy And Safety
Do Not Override Title IX's Prohibition Against
Sex Discrimination* ........................................................18

B.    *The Department Of Education's Title IX Regulations
Do Not Permit Schools To Enact Discriminatory
Restroom Policies Like GCSB's* ................................................22

CONCLUSION ......................................................................................30

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**CASES:**                                                                                  **PAGE**

*Auer* v. *Robbins*, 519 U.S. 452 (1997)................................................................24, 28

*Bowen* v. *Georgetown Univ. Hosp.*, 488 U.S. 204 (1988)......................................28

*Chase Bank USA, N.A.* v. *McCoy*, 562 U.S. 195 (2011) ...................................25, 28

*Christensen* v. *Harris Cnty.*, 529 U.S. 576 (2000) ...................................................27

*Cruzan* v. *Special Sch. Dist. No. 1*, 294 F.3d 981 (8th Cir. 2002) .........................20

*Davis* v. *Monroe Cnty. Bd. of Educ.*, 526 U.S. 629 (1999) .....................................19

*D.L.* v. *Baltimore City Bd. of Sch. Comm'rs*, 706 F.3d 256 (4th Cir. 2013) ...........25

*Doe* v. *Regional Sch. Unit 26*, 86 A.3d 600 (Me. 2014) .........................................26

*Etsitty* v. *Utah Transit Auth.*, 502 F.3d 1215 (10th Cir. 2007)...............................13

*Finkle* v. *Howard Cnty.*, 12 F. Supp. 3d 780 (D. Md. 2014)............................11, 14

*Glenn* v. *Brumby*, 663 F.3d 1312 (11th Cir. 2011)............................................10, 14

*Humanoids Grp.* v. *Rogan*, 375 F.3d 301 (4th Cir. 2004)........................... 25-26, 28

*Jennings* v. *University of N.C.*, 482 F.3d 686 (4th Cir.),
    cert. denied, 552 U.S. 887 (2007)................................................................10

*Kentuckians for the Commonwealth, Inc.* v. *Rivenburgh*,
    317 F.3d 425 (4th Cir. 2003) .......................................................................28

*Lewis* v. *High Point Reg'l Health Sys.*,
    79 F. Supp. 3d 588 (E.D.N.C. 2015) ............................................................14

**CASES (continued):**                                              **PAGE**

*Lusardi* v. *Department of the Army*, No. 0120133395,
2015 WL 1607756 (EEOC Apr. 1, 2015)................................................*passim*

*Macy* v. *Department of Justice*, No. 0120120821,
2012 WL 1435995 (EEOC Apr. 20, 2012)..............................................12, 20

*M.R.* v. *Dreyfus*, 697 F.3d 706 (9th Cir. 2011).........................................................24

*O'Donnabhain* v. *Commissioner*, 134 T.C. 34 (2010) ................................................4

*Oncale* v. *Sundowner Offshore Servs., Inc.*, 523 U.S. 75 (1998) ...........................13

*Price Waterhouse* v. *Hopkins,* 490 U.S. 228 (1989) ........................................*passim*

*Rumble* v. *Fairview Health Servs.*, No. 14-CV-2037,
2015 WL 1197415 (D. Minn. Mar. 16, 2015)........................................11, 14

*Schroer* v. *Billington*, 577 F. Supp. 2d 293 (D.D.C. 2008) .............................*passim*

*Schwenk* v. *Hartford*, 204 F.3d 1187 (9th Cir. 2000).................................. 10-11, 14

*Smith* v. *City of Salem*, 378 F.3d 566 (6th Cir. 2004).......................................10, 14

*Talk Am., Inc.* v. *Michigan Bell Tel. Co.*, 131 S. Ct. 2254 (2011) .........................28

*Ulane* v. *Eastern Airlines, Inc.*, 742 F.2d 1081 (7th Cir. 1984),
cert. denied, 471 U.S. 1017 (1985)...........................................................10, 13

*United States* v. *Southeastern Okla. State Univ.*, No. 5:15-CV-324,
2015 WL 4606079 (W.D. Okla. July 10, 2015) ...........................................14

*Zuni Pub. Sch. Dist. No. 89* v. *Department of Educ.*, 550 U.S. 81 (2007)..............13

**STATUTES:**

Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e *et seq.*........................10

**STATUTES (continued):**                                                          **PAGE**

Title IX of the Education Amendments of 1972 (Title IX),
    20 U.S.C. 1681 *et seq.* .................................................................1
    20 U.S.C. 1681(a) .....................................................................8
    20 U.S.C. 1682 ...........................................................................1
    20 U.S.C. 1687(2)(B)...............................................................14

28 U.S.C. 517 ...............................................................................2, 24

42 U.S.C. 2000d-1 ............................................................................2

Me. Rev. Stat. Ann. Tit. 20-a, § 6501 (2013) ..........................................26

**REGULATIONS:**

28 C.F.R. 0.51 ...................................................................................2

34 C.F.R. 106 ...................................................................................1

34 C.F.R. 106.33 ........................................................................*passim*

Exec. Order No. 12,250, 45 Fed. Reg. 72,995 (Nov. 2, 1980) ..................2

**RULES:**

Fed. R. App. P. 29(a) ......................................................................2

Fed. R. Civ. P. 12(b)(6).....................................................................7

**MISCELLANEOUS:**

American Psychiatric Association, *Gender Dysphoria* (2013),
    http://dsm5.org/documents/gender dysphoria fact sheet.pdf...........................3

**MISCELLANEOUS (continued):**                                                    **PAGE**

DOJ, Office for Civil Rights, Office of Justice Programs, *FAQ: Nondiscrimination Grant Condition in the Violence Against Women Reauthorization Act of 2013* (Apr. 9, 2014), www.justice.gov/ ovw/docs/faqs-ngc-vawa.pdf ........................................................................18

HUD, *Appropriate Placement for Transgender Persons in Single-Sex Emergency Shelters and Other Facilities* (Feb. 20, 2015), https://www.hudexchange.info/resources/documents/Notice-CPD-15-02-Appropriate-Placement-for-Transgender-Persons-in-Single-Sex-Emergency-Shelters-and-Other-Facilities.pdf ...............................................18

Jaime M. Grant *et al.*, *Injustice At Every Turn:  A Report of the National Transgender Discrimination Survey*, National Center for Transgender Equality and National Gay and Lesbian Task Force (2011), http://www.thetaskforce.org/downloads/reports/ntds_ full.pdf.......................................................................................................4, 19

Letter from James A. Ferg-Cadima, OCR Acting Deputy Assistant Secretary of Policy (Jan. 7, 2015)...................................................23

Memorandum to Regional Administrators and State Designees from John B. Miles, Jr., Director of Compliance Programs, Regarding OSHA's Interpretation of 29 C.F.R. 1910.141(c)(1)(i):  Toilet Facilities (Apr. 6, 1998), https://www.osha.gov/pls/oshaweb/ owadisp.show_document?p_table =INTERPRETATIONS&p_ id=22932 ...................................................................................................17

OCR, *Questions and Answers on Title IX and Sexual Violence* (Apr. 29, 2014), www.ed.gov/ocr/docs/qa-201404-title-ix.pdf .....................2

OCR, *Questions and Answers on Title IX and Single-Sex Elementary and Secondary Classes and Extracurricular Activities* (Dec. 1, 2014), www.ed.gov/ocr/docs/faqs-title-ix-s ingle-sex-201412.pdf ................................................................................2, 23

**MISCELLANEOUS (continued):**                                        **PAGE**

OPM, *Guidance Regarding the Employment of Transgender
    Individuals in the Federal Workplace*, http://www.opm.gov/
    policy-data-oversight/diversity-and-inclusion/reference-
    materials/gender-identity-guidance (last visited Oct. 27, 2015) ..................18

OSHA, *A Guide to Restroom Access for Transgender Workers*
    (June 1, 2015), http://www.osha.gov/Publications/OSHA3795.pdf ....... 17-18

Resolution Agreement Between the United States and Arcadia
    Unified School District (July 24, 2013), http://www.justice.gov/
    crt/about/edu/documents/arcadiaagree.pdf ...................................................24

Resolution Agreement Between the United States and Downey Unified
    School District (Oct. 8, 2014), http://www2.ed.gov/documents/press-
    releases/downey-school-district-agreement.pdf ...........................................24

WPATH, *Standards of Care for the Health of Transsexual, Transgender,
    and Gender-Nonconforming People* (7th ed. 2012),
    http://www.wpath.org/uploaded_files/140/files/Standards Of Care, V7
    Full Book.pdf .............................................................................................. 3-5

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT
_____

No. 15-2056

G.G., by his next friend and mother DEIRDRE GRIMM,

Plaintiff-Appellant

v.

GLOUCESTER COUNTY SCHOOL BOARD,

Defendant-Appellee
_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
_____

BRIEF FOR THE UNITED STATES AS *AMICUS CURIAE* SUPPORTING
PLAINTIFF-APPELLANT AND URGING REVERSAL
_____

**INTEREST OF THE UNITED STATES**

Title IX of the Education Amendments of 1972 (Title IX), 20 U.S.C. 1681 *et seq.*, prohibits sex discrimination in educational programs and activities receiving federal financial assistance. The United States Department of Education (ED) provides federal funding to many educational programs and activities and oversees their compliance with Title IX. 20 U.S.C. 1682. Through its Office for Civil Rights (OCR), ED investigates complaints and conducts compliance reviews; it also promulgates regulations effectuating Title IX, 34 C.F.R. 106, and guidance to

- 2 -

help recipients understand their Title IX obligations.  See, *e.g.*, OCR, *Questions and Answers on Title IX and Single-Sex Elementary and Secondary Classes and Extracurricular Activities* (Dec. 1, 2014) (OCR Single-Sex Q&A), www.ed.gov/ocr/docs/faqs-title-ix-single-sex-201412.pdf; OCR, *Questions and Answers on Title IX and Sexual Violence* (Apr. 29, 2014), www.ed.gov/ocr/docs/qa-201404-title-ix.pdf.

The Department of Justice (DOJ) coordinates ED's and other agencies' implementation and enforcement of Title IX.  Exec. Order No. 12,250, 45 Fed. Reg. 72,995 (Nov. 2, 1980); 28 C.F.R. 0.51.  DOJ may file federal actions in Title IX cases where DOJ provides financial assistance to recipients or where ED refers a matter to DOJ.  42 U.S.C. 2000d-1.  Pursuant to 28 U.S.C. 517, the United States filed a Statement of Interest in the district court in this case to protect its interest in the proper interpretation of Title IX and its implementing regulations.  The United States files this brief pursuant to Federal Rule of Appellate Procedure 29(a).

## STATEMENT OF THE ISSUES

We address the following question:

Whether a school district violates Title IX's prohibition on discrimination "on the basis of sex" when it bars a student from accessing the restrooms that correspond to his gender identity because he is transgender.

- 3 -

# STATEMENT OF THE CASE

## 1.    Background

A transgender person is someone whose gender identity (*i.e.*, internal sense of being male or female) differs from the sex assigned to that person at birth. Someone who was designated male at birth but identifies as female is a transgender girl or woman; someone who was designated female at birth but identifies as male is a transgender boy or man.  Gender dysphoria is a medical diagnosis given to individuals who experience an ongoing "marked difference between" their "expressed/experienced gender and the gender others would assign" them. American Psychiatric Association, *Gender Dysphoria*, at 1 (2013), http://dsm5.org/ documents/gender dysphoria fact sheet.pdf.

To alleviate the psychological stress that this disconnect creates, transgender individuals often undertake some level of gender transition to bring external manifestations of gender into conformity with internal gender identity.  The clinical basis for gender transition, and the protocol for transitioning, are well-established.  Since the 1970s, the World Professional Association for Transgender Health (WPATH), an internationally recognized organization devoted to the study and treatment of gender-identity-related issues, has published "Standards of Care," which set forth recommendations for the treatment of gender dysphoria and the research supporting those recommendations.  WPATH, *Standards of Care for the*

- 4 -

*Health of Transsexual, Transgender, and Gender-Nonconforming People* (7th ed.

2012) (WPATH Standards), http://www.wpath.org/uploaded_files/140/files/

Standards Of Care, V7 Full Book.pdf.

A critical stage of gender transition is the "real-life experience," during

which a transgender person experiences living full-time as the gender to which he

or she is transitioning.  See *O'Donnabhain* v. *Commissioner*, 134 T.C. 34, 38

(2010).  This experience necessarily includes using the sex-segregated facilities

(*e.g.*, restrooms) corresponding with that gender.  See WPATH Standards, at 61

("During this time, patients should present consistently, on a day-to-day basis and

across all settings of life, in their desired gender role.").

For individuals for whom genital surgery is appropriate, the WPATH

Standards require that they live full-time in their new gender for at least one year.

WPATH Standards at 21, 58, 60-61.  Contrary to popular misconception, however,

the majority of transgender people do not have genital surgery.  See Jaime M.

Grant *et al.*, *Injustice At Every Turn:  A Report of the National Transgender*

*Discrimination Survey*, National Center for Transgender Equality and National

Gay and Lesbian Task Force, at 2, 26 (2011), http://www.thetaskforce.org/

downloads/reports/ntds_full.pdf (NCTE Survey) (survey of 6450 transgender and

gender non-conforming adults revealed that just 33% of respondents had surgically

transitioned).  Determinations about medical care must be made by physicians and

- 5 -

their patients on an individualized basis.  WPATH Standards at 5, 8-9, 58, 97.  For

some, health-related conditions make invasive surgical procedures too risky; for

others, the high cost of surgical procedures, which are often excluded from

insurance coverage, poses an insurmountable barrier.  See *id*. at 58.  Moreover, and

of special salience to the operation of Title IX, sex reassignment surgery is

generally unavailable to transgender children under age 18.  See WPATH

Standards at 21, 104-106.

2.    *Statement Of Facts*

G.G., a 16-year-old transgender boy, is a junior at Gloucester High School in

Gloucester County, Virginia.  Although G.G. was designated female at birth, in

April 2014, a psychologist diagnosed him with gender dysphoria and started him

on a course of treatment, which included a full social gender transition.  JA29.  As

part of that transition, G.G. legally changed his name to a traditionally male name,

changed the gender marker on his driver's license to male, is referred to by male

pronouns, uses men's restrooms when not at school, and began hormone treatment,

which has deepened his voice, increased his facial hair, and given him a more

masculine appearance.  JA29-30, 60.

In August 2014, at the start of his sophomore year, G.G. and his mother

informed Gloucester High School officials about his gender transition and name

change.  JA30.  School officials changed his name in his school records and

- 6 -

instructed G.G. to email his teachers to explain his transition and request that they
refer to him by his new name and male pronouns.  JA30.  Although G.G. initially
agreed to use a separate restroom in the nurse's office, he soon found this option
stigmatizing and inconvenient, as well as unnecessary, as his teachers and peers
generally respected that he is a boy.  JA30-31.  Accordingly, upon G.G.'s request,
the school permitted him to begin using the boys' restrooms, which he did for
seven weeks without incident.  JA31.

In November 2014, however, some adults in the community learned that
G.G. was using the boys' restroom and demanded that the Gloucester County
School Board (GCSB) bar him from doing so.  JA15.  On December 9, 2014, after
two public meetings, GCSB enacted a policy limiting students to restrooms
corresponding to their "biological genders" and requiring students with "gender
identity issues" to use "an alternative appropriate private facility."  JA16.

The next day, G.G.'s principal informed him that, due to GCSB's new
policy, he could no longer use the boys' restroom and would be disciplined if he
attempted to do so.  JA32.  Although the school subsequently installed three
unisex, single-stall restrooms,[1] G.G. found using these restrooms even more

---

[1]  The school also made several privacy-related improvements to its
communal restrooms, including raising the doors and walls around the stalls and
installing partitions between the urinals in the boys' restrooms.  JA17, 143-144.

- 7 -

stigmatizing than using the nurse's restroom.  JA32.  Therefore, for the rest of his

sophomore year, G.G. tried to avoid using the restroom altogether while at school,

leading him to develop painful urinary tract infections.  JA32-33.

3.    *Procedural History*

On June 11, 2015, G.G. sued GCSB alleging that its policy violated Title IX

and the Equal Protection Clause.  JA9-24.  G.G. also filed a motion for a

preliminary injunction to enjoin GCSB from enforcing the policy and thereby

permit him to resume using the boys' restrooms when school started in September.

JA25-27.  The United States filed a Statement of Interest in support of G.G.'s

preliminary injunction motion.  JA4-5.  On July 7, 2015, GCSB filed a motion to

dismiss G.G.'s complaint for failure to state a claim under Federal Rule of Civil

Procedure 12(b)(6).  JA5.

At a July 27, 2015, hearing to address both motions, the court announced

that it was dismissing G.G.'s Title IX claim based solely on the fact that ED's Title

IX regulations permit schools to provide separate boys' and girls' restrooms.

JA114-116.  The court stated that it would allow G.G.'s equal protection claim to

proceed but postponed ruling on his preliminary injunction motion.  JA129-131.

On September 4, 2015, the district court denied G.G.'s preliminary

injunction motion (JA137-138), and on September 17, 2015, it issued its

memorandum opinion (JA139-164).  As to Title IX, the court stated that it need not

- 8 -

decide whether Title IX's prohibition on sex discrimination includes transgender

discrimination because, in its view, G.G.'s Title IX claim "is precluded by" 34

C.F.R. 106.33, ED's regulation authorizing sex-segregated restrooms.  JA149.

## ARGUMENT

### WHERE A SCHOOL PROVIDES SEPARATE RESTROOMS FOR BOYS AND GIRLS, BARRING A STUDENT FROM THE RESTROOMS THAT CORRESPOND TO HIS OR HER GENDER IDENTITY BECAUSE THE STUDENT IS TRANSGENDER CONSTITUTES UNLAWFUL SEX DISCRIMINATION UNDER TITLE IX

*A.     GCSB's Restroom Policy Violates Title IX*

Title IX provides that no person shall "be excluded from participation in, be

denied the benefits of, or be subjected to discrimination under any education

program or activity" receiving federal financial assistance "on the basis of sex."

20 U.S.C. 1681(a).  Since the Supreme Court's decision in *Price Waterhouse* v.

*Hopkins*, it is well-established that discrimination on the basis of "sex" is not

limited to preferring males over females (or vice versa) but includes differential

treatment based on any "sex-based consideration[]."  490 U.S. 228, 242 (1989)

(plurality).

Here, GCSB's restroom policy denies G.G. a benefit that all of his peers

enjoy—access to restrooms consistent with their gender identity—because, unlike

them, his birth-assigned sex does not align with his gender identity.  The policy

subjects G.G. to differential treatment, and the basis for that treatment—the

- 9 -

divergence between his gender identity and what GCSB deemed his "biological gender"—is unquestionably a "sex-based consideration[]." *Price Waterhouse*, 490 U.S. at 242 (plurality).  GCSB's generalized assertions of safety and privacy cannot override Title IX's guarantee of equal educational opportunity. Accordingly, G.G. established a likelihood of success on his claim that GCSB's policy violates Title IX.

     1.     *Treating A Transgender Student Differently From Other Students Because He Is Transgender Constitutes Differential Treatment On The Basis Of Sex*

GCSB's restroom policy denies G.G. a benefit that every other student at his school enjoys:  access to restrooms that are consistent with his or her gender identity.  Whereas the policy permits non-transgender students to use the restrooms that correspond to their gender identity (because their gender identity and "biological gender" are aligned), it prohibits G.G. from doing so because, although he identifies and presents as male, the school deems his "biological gender" to be female.  Indeed, prohibiting G.G. from using the boys' restrooms was precisely GCSB's purpose in enacting the policy.

Treating a student differently from other students because his birth-assigned sex diverges from his gender identity constitutes differential treatment "on the basis of sex" under Title IX.  Although federal courts initially construed prohibitions on sex discrimination narrowly—as prohibiting only discrimination

- 10 -

based on one's biological status as male or female, see, *e.g.*, *Ulane* v. *Eastern Airlines, Inc.*, 742 F.2d 1081, 1084-1085 (7th Cir. 1984), cert. denied, 471 U.S. 1017 (1985)—the Supreme Court "eviscerated" that approach in *Price Waterhouse*. *Smith* v. *City of Salem*, 378 F.3d 566, 573 (6th Cir. 2004). There, the Court held that an accounting firm violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e *et seq.*, when it denied a female senior manager partnership because she was considered "macho," "aggressive," and not "feminine[]" enough. *Price Waterhouse*, 490 U.S. at 235 (plurality) (citations omitted). In doing so, *Price Waterhouse* rejected the notion that "sex" discrimination occurs only in situations in which an employer prefers a man over a woman (or vice versa); rather, a prohibition on sex discrimination encompasses any differential treatment based on a consideration "related to the sex of" the individual.[2] *Schwenk* v. *Hartford*, 204 F.3d 1187, 1202 (9th Cir. 2000).

A transgender person's transgender status is unquestionably related to his sex: indeed, the very definition of being "transgender" is that one's gender identity does not match one's "biological" or birth-assigned sex. See *Glenn* v. *Brumby*, 663 F.3d 1312, 1316 (11th Cir. 2011) (recognizing "a congruence between

---

[2] Although *Price Waterhouse* arose under Title VII, this court and others "look to case law interpreting Title VII * * * for guidance in evaluating a claim brought under Title IX." *Jennings* v. *University of N.C.*, 482 F.3d 686, 695 (4th Cir.), cert. denied, 552 U.S. 887 (2007); see also JA146.

- 11 -

discriminating against transgender  *  *  *  individuals and discrimination on the
basis of gender-based behavioral norms"); see also *Finkle* v. *Howard Cnty.*, 12 F.
Supp. 3d 780, 788 (D. Md. 2014); *Rumble* v. *Fairview Health Servs.*, No. 14-CV-
2037, 2015 WL 1197415, at *2 (D. Minn. Mar. 16, 2015).  Thus, discrimination
against a transgender person based on the divergence between his gender identity
and birth-assigned sex denies that person an opportunity or benefit based on a
consideration "related to" sex.  *Schwenk*, 204 F.3d at 1202.

Whether viewed as discrimination based on the divergence between G.G.'s
gender identity and "biological" sex or discrimination due to gender transition,
GCSB's policy "*literally* discriminat[es] 'because of . . . sex.'"  *Schroer* v.
*Billington*, 577 F. Supp. 2d 293, 308 (D.D.C. 2008).  As the *Schroer* court
explained, firing an employee because she converts from Christianity to Judaism
"would be a clear case of discrimination 'because of religion,'" even if the
employer "harbors no bias toward either Christians or Jews but only 'converts,'"
because "[n]o court would take seriously the notion that 'converts' are not covered
by the statute." *Id.* at 306.  By the same logic, the court concluded, discrimination
against a person because he has "changed" his sex, *i.e.*, he is presenting as a
different sex from the one he was assigned at birth, would be "a clear case" of
discrimination because of sex.  *Ibid.*

- 12 -

Following the reasoning of *Price Waterhouse*, *Glenn*, and *Schroer*, the Equal Employment Opportunity Commission (EEOC) has concluded that "intentional discrimination against a transgender individual because that person is transgender is, by definition, discrimination 'based on . . . sex'" in violation of Title VII. *Macy* v. *Department of Justice*, No. 0120120821, 2012 WL 1435995, at *11 (EEOC Apr. 20, 2012). Although *Macy* involved an employer's refusal to hire a transgender individual, in *Lusardi*, the EEOC applied *Macy*'s holding to a claim involving a restriction on a transgender employee's restroom access akin to the restriction GCSB placed on G.G. As here, it was undisputed that Lusardi's transgender status "was *the* motivation for [the employer's] decision to prevent [her] from using the common women's restroom." *Lusardi* v. *Department of the Army*, No. 0120133395, 2015 WL 1607756, at *7 (EEOC Apr. 1, 2015). Thus, the EEOC held, because discrimination against a person because she is transgender "is, by definition, discrimination 'based on . . . sex,'" *ibid.*, the employer violated Title VII when it barred Lusardi from using the women's restroom—a resource "that other persons of her gender were freely permitted to use," *id.* at *9—because she is transgender.

To be sure, a few courts have held, largely based on assumptions about what Congress must have intended when it enacted Title VII in 1964, that the prohibition against sex discrimination does not apply to discrimination against

- 13 -

transgender individuals.  See, *e.g.*, *Etsitty* v. *Utah Transit Auth.*, 502 F.3d 1215, 1221-1222 (10th Cir. 2007) (relying on *Ulane*, 742 F.2d at 1084-1087).  But as *Schroer* observed, those decisions "represent an elevation of 'judge-supposed legislative intent over clear statutory text.'"  577 F. Supp. 2d at 307 (quoting *Zuni Pub. Sch. Dist. No. 89* v. *Department of Educ.*, 550 U.S. 81, 108 (2007) (Scalia, J., dissenting)).  It may well be that the Congresses that enacted Title VII in 1964 and Title IX in 1972 did not have transgender individuals in mind.  But the same can be said for other conduct that is now recognized as prohibited sex discrimination under those statutes.  See, *e.g.*, *Oncale* v. *Sundowner Offshore Servs., Inc.*, 523 U.S. 75 (1998).  As the Supreme Court explained in *Oncale*, "male-on-male sexual harassment in the workplace was assuredly not the principal evil Congress was concerned with when it enacted Title VII."  *Id.* at 79.  Nonetheless, the Court emphasized that "statutory prohibitions often go beyond the principal evil to cover reasonably comparable evils, and it is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed."  *Ibid.* Excluding from the statute's purview conduct that falls within its plain text simply because Congress may not have contemplated it "is no longer a tenable approach to statutory construction."  *Schroer*, 577 F. Supp. 2d at 307.

In the wake of *Oncale* and *Price Waterhouse*, numerous courts now recognize that prohibitions against sex discrimination protect transgender

- 14 -

individuals from discrimination.  See, *e.g.*, *Glenn*, 663 F.3d at 1317; *Smith*, 378

F.3d at 573; *Schwenk*, 204 F.3d at 1201; *Finkle*, 12 F. Supp. 3d at 788; *Lewis* v.

*High Point Reg'l Health Sys.*, 79 F. Supp. 3d 588, 589-590 (E.D.N.C. 2015);

*Schroer*, 577 F. Supp. 2d at 308; *United States* v. *Southeastern Okla. State Univ.*,

No. 5:15-CV-324, 2015 WL 4606079, at *2 (W.D. Okla. July 10, 2015); *Rumble*,

2015 WL 1197415, at *2.  This Court should too.  Treating a student adversely

because the sex assigned to him at birth does not match his gender identity is

literally discrimination "on the basis of sex."  20 U.S.C. 1681.

2.      *Where A School Provides Sex-Segregated Restrooms, Denying A*
        *Student Access To The Restrooms Consistent With His Or Her Gender*
        *Identity Denies That Student Equal Educational Opportunity*

Just as "[e]qual access to restrooms is a significant, basic condition of

employment," *Lusardi*, 2015 WL 1607756, at *9, so too is it a basic condition of

full and equal participation in a school's educational programs and activities.  See

20 U.S.C. 1687(2)(B) (defining "program[s] or activit[ies]" to mean "all of the

operations" of a school).  Prohibiting a transgender male student from using boys'

restrooms, when other non-transgender male students face no such restriction,

deprives him not only of equal educational opportunity but also "of equal status,

respect, and dignity." *Lusardi*, 2015 WL 1607756, at *10.

Under GCSB's policy, G.G. may only use either the girls' restroom or a

separate "unisex" restroom.  That other students may choose to use the unisex

- 15 -

restroom does not change the fact that this policy, which was directed at G.G., not only denies G.G.'s "very identity" as a boy, *Lusardi*, 2015 WL 1607756, at *10, but also singles him out in a way that is humiliating and stigmatizing.  For example, even when there is a boys' restroom next to his classroom or locker, G.G. must seek out a unisex restroom in a different part of the school.  See JA32.  In placing this restriction on G.G., GCSB essentially labels him as "other."

The only other "option" made available to G.G.—using the girls' restroom —is illusory.  It is unrealistic to suggest that a student like G.G., who identifies and presents as a boy and whom the school treats as a boy in every other respect, could walk into a girls' restroom without creating a situation that is disruptive to his female classmates and humiliating to him.[3]  Not surprisingly, students put in such an untenable position often try to avoid using the restroom all day—putting them at risk for urinary tract infections and other health problems (see JA33)—rather than use a facility that either conflicts with their gender identity or physically and symbolically marks them "as some type of 'other.'"  JA32.  In other words, denying a transgender boy access to the boys' restroom is often much more than a

---

[3]  Indeed, even before he began masculinizing hormone treatment, G.G.'s female classmates, perceiving him to be a boy, reacted negatively to his presence in the girls' restroom.  JA32.

- 16 -

mere inconvenience or limitation on his ability to use the restroom—it can be an effective denial of a restroom altogether.

As a result of such a policy, transgender students like G.G. are denied the ability to participate fully in and take advantage of their school's educational programs. No one could reasonably expect a student to make it through an entire school day without access to a restroom; any student who attempted to do so would likely experience discomfort and anxiety affecting his ability to concentrate during class, further diminishing his educational experience. See JA32-33. And even if a student could avoid using the restroom during regular school hours, such a restriction would still limit his ability to participate in after-school extracurricular activities that are important to a child's intellectual, social, and emotional development.[4]

Just as an employee is denied equal employment opportunity if he is denied access to an on-site restroom that co-workers of his same gender may use, see

---

[4] And even if a transgender student were willing to use a unisex restroom, the number and location of such restroom(s) may be such that a transgender student at a large school would have difficulty reaching the "authorized" restroom in the allotted time between classes. See, e.g., JA32 (G.G.'s affidavit stating that only one of the unisex restrooms is "located anywhere near the restrooms used by other students" and that none of the unisex restrooms is "located near [his] classes"). A student in such situation may feel as though he needed to limit his movement over the course of the day to ensure proximity to an "authorized" restroom, to avoid being late to class or, even worse, having an accident that would humiliate and stigmatize him further.

- 17 -

*Lusardi*, 2015 WL 1607756, at *9,[5] so too is a student denied equal educational

opportunity when restrictions of these kinds are placed on his ability to use the

restroom.  It is for this reason that the Department of Education—the agency with

primary enforcement authority over Title IX—has concluded that, although

recipients may provide separate restrooms for boys and girls, when a school does

so, it must treat transgender students consistent with their gender identity.  Doing

so is the only way to ensure that the school's provision of sex-segregated restrooms

complies with Title IX's mandate not to subject any student to discrimination on

the basis of sex.[6]

---

[5]  The Department of Labor's Occupational Safety and Health
Administration (OSHA) guidelines require agencies to provide employees access
to adequate sanitary facilities.  See Memorandum to Regional Administrators and
State Designees from John B. Miles, Jr., Director of Compliance Programs,
Regarding OSHA's Interpretation of 29 C.F.R. 1910.141(c)(1)(i): Toilet Facilities
(Apr. 6, 1998), https://www.osha.gov/pls/oshaweb/owadisp.show_document?
p_table =INTERPRETATIONS&p_id=22932.  To that end, OSHA has issued
guidance clarifying that employees "should be permitted to use the facilities that
correspond with their gender identity" and that "[t]he employee," not the employer,
"should determine the most appropriate and safest option for him- or herself."
OSHA, *A Guide to Restroom Access for Transgender Workers*, at 2 (June 1, 2015)
(OSHA Transgender Guidance),
http://www.osha.gov/Publications/OSHA3795.pdf.

[6]  ED's view is consistent with that of numerous other federal agencies,
including the EEOC, the Department of Housing and Urban Development (HUD),
the Office of Personnel Management (OPM), and OSHA, which have all
concluded that, in situations in which a distinction based on sex is permissible
under the law, a transgender person's "sex" must be determined by his or her

(continued…)

- 18 -

3.    *General Invocations Of Privacy And Safety Do Not Override Title IX's Prohibition Against Sex Discrimination*

Although GCSB claims that its policy "seeks to provide a safe learning environment for all students and to protect the privacy of all students" (JA142), such asserted concerns do not justify barring G.G. from accessing the restrooms consistent with his gender identity.  While a school certainly may take steps designed to ensure the safety of its students, general invocations of "safety" provide no basis for denying a student access to the gender-identity appropriate restroom.  To the extent GCSB claims to be concerned about *other students*' safety, it has not provided any factual basis for concluding that G.G.'s use of the boys' restroom poses a safety risk to any student.  A school cannot deny a transgender boy educational opportunities based on a blanket and unfounded

---

(…continued)

gender identity, not by the sex assigned at birth.  See *Lusardi*, 2015 WL 1607756, at *8; HUD, *Appropriate Placement for Transgender Persons in Single-Sex Emergency Shelters and Other Facilities*, at 3 (Feb. 20, 2015), https://www.hudexchange.info/resources/documents/Notice-CPD-15-02-Appropriate-Placement-for-Transgender-Persons-in-Single-Sex-Emergency-Shelters-and-Other-Facilities.pdf; OPM, *Guidance Regarding the Employment of Transgender Individuals in the Federal Workplace*, http://www.opm.gov/policy-data-oversight/diversity-and-inclusion/reference-materials/gender-identity-guidance (last visited Oct. 27, 2015); OSHA Transgender Guidance, *supra* note 5; cf. DOJ, Office for Civil Rights, Office of Justice Programs, *FAQ: Nondiscrimination Grant Condition in the Violence Against Women Reauthorization Act of 2013*, at 8-9 (Apr. 9, 2014), www.justice.gov/ovw/docs/faqs-ngc-vawa.pdf.

- 19 -

assumption that all transgender boys pose a danger to other boys in the restroom just by virtue of being transgender.

To the extent GCSB claims to be concerned about *transgender students'* safety, such a claim is belied by the fact that the policy it enacted makes it *more likely* that transgender students will be subject to harassment (or worse). In many cases, a transgender student's classmates do not even know he is transgender; requiring him to use either a restroom contrary to his gender identity or a separate unisex restroom thus functions to "out" him, putting the student at increased risk of harm. See NCTE Survey at 154, p. 4, *supra* (noting that "outing" a person as transgender "presents the possibility for disrespect, harassment, discrimination or violence"). Where the student is already "out" publicly—as G.G. was here, largely due to the public hearings putting his transgender status front-and-center—the school can, and should, monitor other students' treatment of him and put measures in place to ensure that he not suffer sex-based harassment in the restroom or anywhere else. See *Davis* v. *Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 650 (1999) (school violates Title IX when it is deliberately indifferent to known student-on-student sexual harassment). The appropriate solution, in other words, is to monitor, prevent, and punish the students *doing* the harassing, not to deny the

- 20 -

vulnerable student an equal educational opportunity in the name of protecting him.[7]

Likewise, however commendable an interest in student privacy may be in the abstract, general appeals to "privacy" cannot justify denying transgender students the right to use gender-identity appropriate restrooms.  With regard to its existing restrooms, a school can take—and, in fact, Gloucester High School has taken—measures to enhance privacy, such as "adding or expanding partitions between urinals in male restrooms," and "adding privacy strips to the doors of stalls in all restrooms."  JA17.  If a school wishes to accommodate students who are particularly modest, it may create—and, in fact, Gloucester High School has created—additional single-user restroom options.  JA19.  What it cannot do in the name of "privacy" is exclude a male student from the boys' restroom and require him to use a separate restroom because he was assigned a different sex at birth than other boys.  The desire to accommodate other students' (or their parents') discomfort cannot justify a policy that singles out and disadvantages one class of students on the basis of sex.  *Macy*, 2012 WL 1435995, at *10 & n.15; cf. *Cruzan* v. *Special Sch. Dist. No. 1*, 294 F.3d 981, 983-984 (8th Cir. 2002) (dismissing

---

[7]  It goes without saying that if a student is being harassed in the restroom because of his religion or his disability, the appropriate solution is to restrict and punish the harasser, not to single out the victim of harassment and require *him* to use a separate bathroom.

- 21 -

female employee's claim alleging that transgender female co-worker's use of women's restroom created hostile work environment).

GCSB's claim that it has "had a long-standing practice" of restricting restroom use by "biological sex" to "respect the safety and privacy of all students" (Doc. 32, at 6 (brief in support of motion to dismiss); see also Doc. 46, at 3 (reply to appellant's response to motion to dismiss)), is belied by the fact that it needed to enact a formal policy establishing such a restriction. Indeed, the reality is that, in the context of restrooms outside the home, people generally use the facilities that are appropriate for them based on their gender identity and expression; nobody is stationed at the door asking for a birth certificate or the results of a chromosome test, or checking to see what genitals the people entering the facility have. It is only in response to transgender people gaining more visibility that schools and other entities have begun to depart from that practice and demand that restroom access be based on "birth" or "biological" sex. And even then, as this case suggests, employers and educational institutions appear to enforce such bathroom policies predicated on "birth" or "biological" sex against only those individuals who have self-identified as transgender or been outed by others.

In short, although promoting safety and privacy are legitimate goals in the abstract, neither of these rationales can justify a policy that denies G.G.—and other

- 22 -

students like him—not just access to the gender-appropriate restroom but, more
fundamentally, an equal opportunity at an education.

B.   *The Department Of Education's Title IX Regulations Do Not Permit Schools
To Enact Discriminatory Restroom Policies Like GCSB's*

Contrary to the district court's conclusion, ED's Title IX regulations do not
"preclude[]" G.G.'s Title IX claim.  JA149.  The regulation in question states only
that a school "may provide separate toilet  *  *  *  facilities on the basis of sex"
under Title IX, as long as the "facilities provided for students of one sex" are
"comparable to such facilities provided for students of the other sex."  34 C.F.R.
106.33.  It is silent on the question at issue here:  whether, once a school has
provided separate boys' and girls' restrooms pursuant to Section 106.33, it may
prohibit a male student from accessing the boys' restrooms because he is
transgender.[8]

The district court's conclusion that Section 106.33 "clearly" permits
GCSB's restroom policy (JA152) directly contradicts the interpretation of the
Department of Education—the agency that promulgated the regulation.  ED

---

[8]  G.G. does not challenge the existence of male and female restrooms,
Appellant's Br. 31, and for good reason.  ED has concluded that the mere act of
providing separate restroom facilities for males and females does not violate Title
IX (as long as the facilities are comparable), see 34 C.F.R. 106.33, which is
reasonable because such segregation does not disadvantage or stigmatize any
student but simply comports with a historical practice when using multi-user
restroom facilities outside the home.  See also Appellant's Br. 36-37.

- 23 -

interprets Section 106.33 to mean that recipients may provide separate restrooms for boys and girls.  Section 106.33 does not, in ED's view, give schools the authority to decide that only those males who were assigned the male sex at birth can use the boys' restroom.  To the contrary, ED has stated explicitly that although "[t]he Department's Title IX regulations permit schools to provide sex-segregated restrooms," when a school elects to do so, it "generally must treat transgender students consistent with their gender identity" so as not to violate Title IX.  JA55 (Letter from James A. Ferg-Cadima, OCR Acting Deputy Assistant Secretary of Policy (Jan. 7, 2015)); see also OCR Single-Sex Q&A at 25 (same guidance for classes and activities).[9]

That interpretation is consistent with how ED has enforced Title IX in this context.  ED has reached voluntary resolution with two school districts that had imposed restrictions on transgender students' restroom access similar to GCSB's policy; the agreements provide that those districts will treat transgender students consistent with their gender identity in all aspects of their education, including

---

[9] ED's guidance does not limit a school's ability to accommodate a transitioning student's voluntary request to phase in his access to restrooms of his new gender, as was done here.  Absent such a request, however, schools must treat a transitioning student consistent with his gender identity.

- 24 -

their restroom access.[10]  ED has also, in conjunction with DOJ's Civil Rights

Division, filed two Statements of Interest and the instant *amicus* brief asserting

that, although recipients may provide separate boys' and girls' restrooms pursuant

to Section 106.33, a recipient violates Title IX when it prohibits transgender

students from using restrooms consistent with their gender identity.  See Doc. 38;

Statement of Interest of the United States, *Tooley* v. *Van Buren Pub. Sch.*, No.

2:14-CV-13466 (E.D. Mich. Feb. 20, 2015).  Thus, ED plainly does not interpret

Section 106.33 to permit schools to enact policies like GCSB's.

Where there is dispute about the meaning of a regulation, the agency's

interpretation is "controlling unless plainly erroneous or inconsistent with the

regulation."  *Auer* v. *Robbins*, 519 U.S. 452, 461 (1997) (citation and internal

quotation marks omitted).  That "deferential standard," *ibid.*, is certainly met

here.[11]  ED interprets its regulation as clarifying that schools may provide separate

---

[10]  Resolution Agreement Between the United States and Downey Unified
School District (Oct. 8, 2014), http://www2.ed.gov/documents/press-
releases/downey-school-district-agreement.pdf; Resolution Agreement Between
the United States and Arcadia Unified School District (July 24, 2013),
http://www.justice.gov/crt/about/edu/documents/arcadiaagree.pdf.

[11]  *Auer* deference is owed to agency interpretations expressed in *amicus*
briefs and Statements of Interest filed pursuant to 28 U.S.C. 517, see *Auer*, 519
U.S. at 462 (*amicus* brief); *M.R.* v. *Dreyfus*, 697 F.3d 706, 735 (9th Cir. 2011)
(Statement of Interest), as well as those issued "through an informal process" like
(continued…)

- 25 -

restrooms for boys and girls without running afoul of Title IX.  That is the most

natural reading of the regulatory language.  See 34 C.F.R. 106.33 ("A recipient

*may provide* separate toilet  *  *  *  facilities on the basis of sex, but such facilities

provided for *students of one sex* shall be comparable to such facilities provided for

*students of the other sex*.") (emphasis added).  Because the regulation is silent on

what the phrases "students of one sex" and "students of the other sex" mean in the

context of transgender students, ED has provided guidance on that question.  ED

interprets the regulation as requiring schools to treat students consistent with their

gender identity because doing so ensures that transgender students are not denied

equal educational opportunity for the reasons described above.  ED's interpretation

is a reasonable one, and is thus entitled to deference.  See *Chase Bank USA, N.A.* v.

*McCoy*, 562 U.S. 195, 207 (2011) (where regulation is silent as to the "crucial

interpretive question," court must look to the agency's "own interpretation of the

regulation"); *Humanoids Group* v. *Rogan*, 375 F.3d 301, 306 (4th Cir. 2004)

(deferring to agency interpretation of how its trademark regulation should apply in

situation not explicitly addressed by regulation's language).

---

(…continued)
an "opinion letter," *D.L.* v. *Baltimore City Bd. of Sch. Comm'rs*, 706 F.3d 256, 259
(4th Cir. 2013).

- 26 -

Section 106.33 is comparable to a Maine statute requiring that restrooms in school buildings be "[s]eparated according to sex." Me. Rev. Stat. Ann. Tit. 20-a, § 6501 (2013). In *Doe* v. *Regional School Unit 26*, 86 A.3d 600 (Me. 2014), the Maine Supreme Court concluded that this statute "does not mandate, or even suggest, the manner in which transgender students should be permitted to use sex-separated facilities." *Id.* at 605-606. Thus, the court concluded, an elementary school could not rely on the statute to justify its decision to bar a transgender girl from the girls' restroom. *Id.* at 606. As the court explained, although the statute requires schools to provide "separate bathrooms for each sex," it "does not—and school officials cannot—dictate the use of the bathrooms in a way that discriminates against students in violation of" the State's nondiscrimination law. *Ibid.* ED reasonably reached the same conclusion with regard to 34 C.F.R. 106.33.

The district court's conclusion that Section 106.33's plain language supports *only* the court's interpretation and therefore "is not ambiguous" (JA152), does not withstand scrutiny.[12] The district court's strained reading—that by using the term "on the basis of sex," Section 106.33 authorizes schools to use whatever sex-based criterion they wish to determine who qualifies as a boy or girl for restroom use—divorces the phrase from the context in which it appears. In contrast to Title IX's

---

[12] Whether a regulation is ambiguous is a legal question that this Court determines *de novo*. *Humanoids*, 375 F.3d at 306.

- 27 -

statutory language banning sex-based discrimination, the phrase "on the basis of sex" in the context of Section 106.33 most naturally refers to the commonplace, and long-accepted, practice of providing separate male and female restrooms. It would be incongruous for the Department of Education, in a regulation implementing Title IX's antidiscrimination provision, to have given schools free rein to use whatever sex-based criterion they want in determining who gets to use each restroom. Certainly a school that has created separate restrooms for boys and girls could not decide that only students who dress, speak, and act sufficiently masculine count as boys entitled to use the boys' restroom, or that only students who wear dresses, have long hair, and act sufficiently feminine may use the girls' restroom. To do so would engage in precisely the sort of sex stereotyping that *Price Waterhouse* forbids. Yet, the district court's interpretation of Section 106.33 would seem to allow just that. That is not a sensible reading.

But even if the district court's interpretation of Section 106.33 were plausible, that does not render ED's reading incorrect; at most it would mean that the regulation is ambiguous. This is not a case like *Christensen* v. *Harris County*, which involved a regulation whose plain language precluded the agency's interpretation. 529 U.S. 576, 587-588 (2000) (regulation's use of "may" instead of "must" made regulation permissive, thus foreclosing agency's interpretation setting forth a mandatory requirement). Here, Section 106.33's language does not "clearly

- 28 -

preclude[]" ED's interpretation; indeed, as explained, ED's interpretation is the best reading of its own regulation. *Humanoids*, 375 F.3d at 306. But to the extent there is any ambiguity, this Court must give "binding deference" to ED's reasonable interpretation of its own regulation. *Kentuckians for the Commonwealth, Inc.* v. *Rivenburgh*, 317 F.3d 425, 439 (4th Cir. 2003).

The district court's suggestion that ED arrived at its interpretation "for the purposes of litigation" is inaccurate. JA153. ED is "not a party to this case"; it advances its interpretation of Section 106.33, both below and on appeal, as an *amicus curiae*, just as the Department of Labor did in *Auer*. *Chase Bank*, 562 U.S. at 209. Thus, its position "is in no sense a '*post hoc* rationalizatio[n]' advanced by an agency seeking to defend past agency action against attack." *Auer*, 519 U.S. at 462 (quoting *Bowen* v. *Georgetown Univ. Hosp.*, 488 U.S. 204, 212 (1988)). To the contrary, the interpretation of Section 106.33 that ED advances here "is entirely consistent with its past views," as expressed in the agreements it has reached with school districts, in its guidance on single-sex activities, in OCR's 2014 letter, and in its Statement of Interest in *Tooley*. *Chase Bank*, 562 U.S. at 210.

The district court's characterization of ED's interpretation as "newfound" (JA153) is also misplaced. Section 106.33's application to the context of transgender students' restroom access "did not arise until recently." *Talk Am., Inc.* v. *Michigan Bell Tel. Co.*, 131 S. Ct. 2254, 2263 (2011) (according *Auer* deference

- 29 -

to agency's new interpretation of its "longstanding" regulations). For most of its existence, there was no dispute about Section 106.33's meaning; it was understood simply to mean what it says, *i.e.*, that Title IX recipients can provide separate boys' and girls' facilities. It is only in recent years, as schools have confronted the reality that some students' gender identities do not align with their birth-assigned sex, that schools have begun citing Section 106.33 as justification for enacting new policies restricting transgender students to facilities based on their "birth" or "biological" sex. It is to those "newfound" policies that ED's interpretation of the regulation responds. Providing guidance on how its regulations apply in new contexts is precisely the role of a federal agency.

ED has reasonably concluded that, although Section 106.33 permits schools to provide separate boys' and girls' restrooms, when a school elects to do so, it must permit students to use the restrooms that are consistent with their gender identity. Because ED's interpretation of its own regulation controls, the district court erred in dismissing G.G.'s Title IX claim on the ground that Section 106.33 authorizes GCSB's restroom policy.

- 30 -

## CONCLUSION

GCSB's restroom policy singles G.G. out and treats him differently from all other students because the sex he was assigned at birth does not align with his gender identity.  Because that policy is "*literally* discrimination 'because of . . . sex,'" *Schroer*, 577 F. Supp. 2d at 308, G.G. established a likelihood of success on his Title IX claim, and the district court thus erred in dismissing it.

<div style="margin-left: 50%;">

Respectfully submitted,

</div>

JAMES COLE, JR.                    GREGORY B. FRIEL
  General Counsel                     Deputy Assistant Attorney General

FRANCISCO LOPEZ                    s/ Christine A. Monta
VANESSA SANTOS                     DIANA K. FLYNN
MICHELLE TUCKER                    SHARON M. MCGOWAN
  Attorneys                        CHRISTINE A. MONTA
  U.S. Department of Education       Attorneys
  Office of the General Counsel      U.S. Department of Justice
                                                 Civil Rights Division
                                                 Appellate Section – RFK 3730
                                                 Ben Franklin Station
                                                 P.O. Box 14403
                                                 Washington, DC 20044-4403
                                                 (202) 353-9035

## CERTIFICATE OF COMPLIANCE

I certify, pursuant to Federal Rule of Appellate Procedure, that the attached BRIEF FOR THE UNITED STATES AS *AMICUS CURIAE* SUPPORTING PLAINTIFF-APPELLANT AND URGING REVERSAL:

(1) complies with Federal Rules of Appellate Procedure 29(d) and 32(a)(7)(B) because it contains 6727 words; and

(2) complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2007, in 14-point Times New Roman font.

s/ Christine A. Monta
CHRISTINE A. MONTA
 Attorney

Dated:  October 28, 2015

## CERTIFICATE OF SERVICE

I certify that on October 28, 2015, I electronically filed the foregoing BRIEF FOR THE UNITED STATES AS *AMICUS CURIAE* SUPPORTING PLAINTIFF-APPELLANT AND URGING REVERSAL with the Clerk of the Court using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

I further certify that eight paper copies of the electronically-filed brief were sent to the Clerk of the Court by first class mail.

s/ Christine A. Monta
CHRISTINE A. MONTA
 Attorney